No. 31,675

Mary Turner, *Appellee*, v. The City of Wichita, *Appellant*.

(33 P. 2d 335.)

Opinion filed June 9, 1934.

*Vincent F. Hiebsch* and *K. W. Pringle,* both of Wichita, for the appellant.
*John B. Bryant,* of Wichita, for the appellee.

The opinion of the court was delivered by

Thiele, J.: This was an action for damages.

The petition alleged that the city of Wichita failed to use reasonable diligence to ascertain whether trees in and along its streets were safe and to remove decayed and dead branches thereof liable to fall upon travelers in the street, and that on October 18, 1932, about 10 p. m., plaintiff's son, while proceeding eastward on the sidewalk on the north side of Murdock avenue, just east of its intersection with Lawrence avenue, was struck by a falling limb from a

tree located in the street slightly north of the northeast intersecting lines of the above streets, and that the injuries received caused his death. It was alleged the limb which fell and struck the plaintiff was four to six inches in diameter, about three or four feet in length, and that it fell from a height of about twenty to twenty-five feet above the ground.

So far as necessary to be noticed here, the answer alleged a general denial, and that if the deceased was struck by the falling limb as alleged, that the accident and resulting injuries were caused by an act of God, in that there was a sudden, unseasonable and unanticipated cyclonic windstorm in the nature of a tornado in said city generally and in the vicinity of the accident, and that the trees in the vicinity were at the time in condition to withstand any windstorm humanly to be anticipated. The answer further alleged that the deceased was not taking proper precautions and using the care and precautions an ordinarily prudent man would have used for his own safety under the circumstances existing at the time and place.

At the trial it was shown that the accident occurred at the location alleged, that the tree from which the falling branch came was a maple tree standing in the street just north of the northeast intersection of the streets, that a filling station was located on the lot at the corner, and that the plaintiff's son was struck by the falling limb and died from the injuries received. It was shown that the deceased lived with his mother, who operated a hotel; that he was twenty-four years of age and unmarried and assisted her, and that if he had not, it would have cost her fifty dollars a month to have other help. There was conflicting evidence as to the windstorm, some of the witnesses stating it was sudden, unusual and whipping; that it broke plate-glass windows and raised papers to the height of ten-story buildings; other testimony tended to show the wind was not unusual and that similar winds occurred three or four times a year. The director of parks testified that in 1929 and 1931 all trees in the vicinity, including the tree in question, were trimmed; that the branch which struck deceased broke off thirty feet above the ground; that four blocks north of the scene of the accident a live, sixteen-inch maple tree was blown down, and within six or eight blocks a large cottonwood tree three and one-half feet in diameter was badly twisted, and he further testified that the branch which fell had a cavity in it and in his opinion was alive in the summer of 1932, and that it was difficult to see dead branches above in a high

tree due to live foliage below. Four employees of the park department also testified to trimming the tree, one of whom stated he had examined and measured the tree after the accident, and that from the base of the tree to the scene of the accident was forty-four feet, and that the distance from where the limb broke off to where it struck deceased was approximately fifty-one feet.

The jury returned a general verdict against the city and answered special questions adversely to its contentions.

The city filed a motion for judgment notwithstanding the verdict for two reasons: the evidence as a whole showed plaintiff was not entitled to recover, and plaintiff failed to prove she had complied with the provisions of R. S. 12-105, and also filed a motion for a new trial, alleging, among other grounds, newly discovered evidence which could not, with reasonable diligence, have been discovered and produced at the trial. Both motions were denied by the court.

Attention will be directed briefly to the appellant's contention that the evidence as a whole showed plaintiff was not entitled to recover. The city offered evidence that it had more than 75,000 trees standing on that portion commonly called the parking and contends that it is physically impossible by any reasonable expenditure of money to keep the trees in such condition that in times of high winds some of the limbs or branches may not be broken off and thrown to the ground; that its only duty is to use ordinary care in keeping the streets in a reasonably safe condition, citing *City of Atchison v. Jansen,* 21 Kan. 560, and that it is not an insurer of the safety of travelers on the street. It further contends that the maintenance of the trees is a governmental function under R. S. 13-2526 and the city is not liable in any event, and upon this ground recovery has been denied in some states. (See White on Negligence of Municipal Corporations §§ 23 and 24 and the cases cited under note 25 to the last section.) Whatever might be said about maintenance of trees in a public park being a governmental function, here the tree stood in the street, and if the tree was defective, the defect must be treated similarly to other defective conditions in the street. In the last-mentioned text, § 403, it is said:

"The liability of a city for an injury to a traveler through the falling of a tree upon him while lawfully using the highway rests on the principle already discussed. (Liability for falling objects.) If the city has, under its charter or governing statute, the power to remove such a dangerous nuisance, and if, under the law of the jurisdiction, it is liable in damages to travelers for failing to keep its streets and highways in a reasonably safe condition for public

travel, then it may become liable to pay damages for an injury sustained by a traveler through the falling of a tree or rotten limb, provided, of course, it had notice of its dangerous condition, or the circumstances were such that, in the exercise of its duty of caring for its streets and highways, it ought to have known it. This principle is plainly applicable to the case of a dangerous tree standing within the limits of the highway. . . . This rule of liability is obviously stronger where the city itself maintains the tree under an authority granted in its charter or governing statute."

It would seem, however, that, owing to well-known and recognized weather conditions in Kansas, a rule with respect to the ordinary defects in streets should not be given full force and effect so far as pertains to falling branches and limbs from trees. It is of common knowledge that throughout this state, at certain times, the wind blows with considerable velocity, and that tornadoes and tornado-like winds occur with some frequency. It is also common knowledge that there are many storms not approaching a tornado in severity, but in which the wind reaches a velocity in which limbs and branches from live trees are torn loose and thrown to the ground and live trees are uprooted—in fact, the evidence in the instant case shows those very things happened within a short distance of where the fatal accident occurred. If we were to lay down a rule to the effect that a city is the insurer of the safety of its streets from falling branches and limbs of trees, it might be forced to cut down every large tree in order to avoid the possible hazard due to the recurring high winds. It would seem to be a more proper rule that a city is liable in damages to a person injured by a falling branch or limb of a tree, only when the city has notice of the defective condition of the tree, and the branch or limb falls on account of its decayed or rotted condition or is thrown down as the result of usual and ordinary winds; but in case a high and more or less unusual wind is blowing— and it need not be a tornado nor even of unprecedented velocity— and it is obvious to a person of ordinary intelligence traveling upon the street that limbs and branches, either decayed, rotted or living, from trees standing in the highway may be thrown down, there is no liability, unless the condition of the tree or the limbs or branches thereof is so patently bad and has existed for such length of time that permitting them to remain is equivalent to an utter disregard of the safety of the traveler in the street.

In the instant case we are not able to say as a matter of law that the city is not answerable in damages. While there was evidence that the wind was of great velocity, there was also evidence to the

contrary. The admitted fact that the wind blew the falling branch a distance of forty-four feet east while it was falling downward a distance of about thirty to thirty-five feet is rather persuasive as to the strength and velocity of the wind. An exhibit, a photograph of the tree taken after the accident, makes it appear that the tree in question had been "topped" and that the dead or rotted portion which fell could be easily discerned, unless it was hidden by lower foliage. Whether it was so hidden prior to the accident was not fully developed in the testimony further than that an attendant at the filling station, who had worked there three weeks prior to the accident, stated he could see it was dead. How much longer it could be seen was not shown. Under the circumstances we cannot say as a matter of law that plaintiff did not present facts sufficient to show the city's liability.

As to the last ground mentioned in the motion for judgment, it may be here observed that the petition made proper allegation of service of claim against the city, a copy of the claim being attached to the petition. So far as the record shows, there was no proof of service nor was the claim offered in evidence. It is not claimed by the appellant that it was not properly served. Although error is assigned for failure to prove filing of the claim, there is no argument in the brief with respect thereto. The appellant's answer admitted that a claim was filed, which was not allowed because defendant denied liability thereon, and a similar admission was made at the trial. Under these circumstances it would seem that the ruling was correct under *Rogers v. City of Coffeyville*, 95 Kan. 171, 147 Pac. 816.

As has been mentioned, one of the grounds for the motion for a new trial was newly discovered evidence. On the hearing of the motion there was offered the affidavit of the city attorney showing that he and his assistant attempted to ascertain the occupation of the deceased and how much, if anything, he contributed to the support of his mother; that he had interviewed acquaintances of the deceased, but was unable to obtain any definite information; that he was unable to locate any person who could testify as to deceased's staying with his mother and the amount of work he did; that about a month after the trial he was informed that one George Johnson was familiar with the facts and affiant immediately communicated with him. The affidavit also set out in further detail diligence used.

The affidavit of the assistant city attorney stated the claim of

plaintiff was referred to him for investigation, and he made an investigation of the circumstances by members of the park department and the police force, had photographs taken of the site, a drawing made, reviewed the information obtained by the city attorney, was informed that the only witnesses to the accident were two attendants at the filling station on the corner and two persons with an ambulance then being serviced and was informed there were no other witnesses so far as they knew; that he interviewed the city physician and members of the police force who had investigated the accident, as well as the plaintiff in the action, in an attempt to learn of the activities of the deceased and how much assistance he was, if any, to his mother; that he never heard of George Johnson until June 1, 1933 (the trial was May 4, 1933), when he was informed that someone had telephoned the city attorney that Johnson had information concerning the accident, and that he immediately started out to locate Johnson, which he did on June 2; that none of the investigations prior thereto had ever disclosed any Johnson as knowing anything about the accident, and that neither affiant nor the defendant by the exercise of reasonable diligence could or did discover the witness or the evidence furnished by him in his affidavit.

Johnson's affidavit stated he was acquainted with Turner, the deceased, and that on the evening of the accident he met him at the north end of the block where the accident occurred and walked south with him; that at said time and place a violent windstorm suddenly arose; that affiant and Turner were progressing rapidly toward the filling station on the corner and affiant shouted to Turner:

"You had better step lively and get in out of this wind. This is a bad storm."

to which Turner replied:

"Oh, I have been out in worse storms than this,"

and proceeded onward. Affiant again warned Turner and said:

"You might get hurt by signs or broken tree limbs hitting you. Some of those limbs are liable to blow off of those trees there. I am going to get in before I get something on my bean."

That affiant went into the filling station and Turner proceeded; that the next he knew someone shouted a fellow hurt, and he saw Turner prostrate, saw some men pick him up, put him in the funeral car and saw the car leave for the hospital. Affiant further

stated that during 1932 he lived for some weeks at the hotel operated by plaintiff and there became acquainted with Turner and during said time saw him every day and evening; that he observed Turner's conduct and activity, and during all of said time never saw him do any work; that he was always idle and was not engaged in helping his mother; that the mother complained that the son caused her a great deal of trouble and worry, was unwilling to help her, did not help her operate the hotel, and continually asked for spending money.

It has been repeatedly held that the granting of a motion for a new trial rests in the sound discretion of the trial court (*Briggs v. Shepler*, 115 Kan. 614, 224 Pac. 61), and that in order to entitle a party to a new trial on the ground of newly discovered evidence, it must be shown it could not have been produced by reasonable diligence (*Dunham v. Bokel*, 105 Kan. 369, 184 Pac. 636; *Ghumm v. Josch*, 133 Kan. 16, 298 Pac. 751); it must not be merely cumulative (*Atkinson v. Wichita Gas Co.*, 136 Kan. 854, 18 P. 2d 127; *Raney v. Mooney*, 136 Kan. 787, 18 P. 2d 133); and such newly discovered evidence, to be a ground for a new trial, must be such as would, with reasonable probability, produce a different result (*Raney v. Mooney*, supra; *Rohr v. Riedel*, 110 Kan. 107, 202 Pac. 852). We are not the triers of the fact and cannot say that the statements of Johnson, if testified to in the trial court, would be believed in whole or in part, but we are warranted in saying that if believed they would probably produce a different result, for they show that the deceased was guilty of conduct that contributed to his untimely end. Further, his statements tend to show that the deceased was not contributing to his mother's support, as she testified, and on which phase of the case she was the sole witness. As we view the situation, the appellant has made a sufficient showing of diligence, the newly discovered evidence was not merely cumulative, it would probably produce a different result, and the court did not properly exercise its discretion in refusing a new trial, and thereby erred. A new trial should have been granted.

The erroneous ruling of the trial court, denying a new trial for newly discovered evidence, requires that the cause be remanded for a new trial. It is therefore unnecessary to discuss the question whether the amount allowed by the jury in its verdict is excessive.

The judgment of the trial court is reversed, and the cause remanded for a new trial.