No. 34,094

JASPER WEBB and BERTHA WEBB, *Appellees,* v. THE CITY OF OSWEGO, *Appellant.*

(86 P. 2d 553)

Opinion filed January 28, 1939.

*Elmer W. Columbia,* of Parsons, for the appellant.

*Douglas Hudson, Howard Hudson,* both of Fort Scott, and *Charles E. Prettyman, Jr.,* of Neosho, Mo., for the appellees.

*Albert B. Martin,* of Lawrence, as *amicus curiæ.*

.The opinion of the court was delivered by

THIELE, J.: This was an action by plaintiffs to recover damages for the wrongful death of their nineteen-year-old son, and from a judgment in their favor the defendant city appeals.

Briefly stated, the petition charged the city owned and operated its electric light and distribution system and had a line of poles and wires along the west side of a north-and-south alley in block 26; and that plaintiffs lived in a barn near the north end of the block and on the west ends of the lots east of the alley; that on July 19, 1937, the city had in effect ordinance No. 573 authorizing the city engineer to trim or remove limbs of trees growing on or along the streets and alleys interfering, or which might reasonably be expected to interfere, with the operation and maintenance of, or damage, the electrical distribution system of the city; that on July 19, 1937, and for a long period prior thereto, on private property immediately to the west, was a tree, the limb of which extended east and over the defendant's wires; that the limb was heavy and rotten and there was danger of its falling and carrying the wires under it to the ground, and that defendant knew thereof but failed to remove the limb or protect its wires; that on July 19, 1937, about 1 o'clock a. m., the above limb fell and carried to the ground one of the wires of the defendant's distribution system, the wire carrying approximately 2,300 volts of electricity; that plaintiff's son, Jack, was proceeding along the alley and came in contact with the fallen wire and was electrocuted. By way of recapitulation, the negligence specifically alleged was in maintaining the high-voltage wires under the dead and rotten limb, when the city knew or by exercise of reasonable care could have known of the dangerous situation, in permitting the insulation on the high-voltage wires to become worn, torn and removed, and in failing to maintain in proper order a circuit breaker which would have broken the circuit when the high-voltage line became grounded. Allegations as to the son's earnings, the parents' loss, and notice of claim to the city need not be detailed. Defendant's motion to strike parts of the petition was denied, and it then answered, admitting it owned and maintained an electric distribu-

tion system and that it had a line of five wires in the particular alley, and alleging the wires were properly insulated. It was also alleged that on the night in question there was a sudden, unseasonable and unanticipated cyclonic wind, rain and electric storm, and that the top middle wire was broken, and that the break was caused by the storm and by an act of God and something over which the city had no control. It was further alleged that the city did not know the cause of the break in the wire, and that if the wire was broken by the tree limb, as described in the petition, that the limb was torn from the tree by the storm; that the city was in no wise responsible for the tree, etc., and that the injuries to the plaintiff's son were caused by a condition created by an act of God, coupled with negligence of the son in taking hold of the wire.

At the trial each party offered his evidence and the cause was submitted to the jury under instructions of which no complaint is made. The jury returned a verdict for plaintiffs for $3,500, and answered special questions as follows:

"1. Do you find that the break in the wire in question was caused by an act of God as defined to you by the court? A. No.

"2. Are you able to state from the evidence what caused the break in the wire in question? A. Yes.

"3. Do you find that the death of Jack Donald Webb was the result of an unavoidable accident? A. No.

"4. Do you find that Jack Donald Webb committed acts of negligence which contributed to his death? A. No.

"5. Do you find defendant guilty of negligence which caused the death of Jack Donald Webb? A. Yes.

"6. If you answered the foregoing question in the affirmative, please state what acts of negligence defendant was guilty of. A. At lack of proper supervision and unsafe maintenance of distribution system and the trimming and cutting of the tree.

"7. How far was the tree from which the limb in question was blown, west of the west line of the alley on private property? A. 25 ft., 9 in.

"8. What was the length of the tree limb in question previous to the storm? A. No evidence introduced relative to length of limb before the storm.

"9. What amount of money did Jack Donald Webb earn in the year just preceding his death? A. $137.

"10. How much did he contribute to plaintiffs during the year just preceding his death? A. No specific evidence introduced in the testimony stating any set amount for support during his last year of life."

Defendant filed its motion for judgment on the answers to the special questions, notwithstanding the general verdict, and its motion for a new trial, and these motions being denied, it appeals.

Appellant first complains the trial court erred in not sustaining its motion to strike the allegations of the petition with reference to ordinance No. 573, its claim being that a city is not liable in damages for failure to enforce its ordinances and that the inclusion of the allegations with respect to it are prejudicial. Had the attempt been to fasten liability on the city because of its failure to enforce the ordinance, perhaps the contention would be good. Appellee answers that the ordinance was not pleaded as constituting an act of negligence, that it was not introduced to show a violation of its terms as constituting negligence, nor was it so submitted to the jury. Assuming the city would be responsible for negligently permitting limbs of trees to interfere with its electrical distribution system, before it could be held liable the plaintiff must show the condition to be one which, under the circumstances, would result in damage to some person, and one which might reasonably have been foreseen by a man of ordinary prudence and foresight, and it must have been known to the governing body of the city or have existed for such length of time that knowledge may be presumed. The manner in which the ordinance is pleaded, and its relation to the context of the petition, discloses the purpose of including it was to show the city recognized it had a duty to perform in maintaining its distribution system, and had taken steps to enable it to perform that duty. We do not think the trial court erred in refusing to strike the allegations respecting the ordinance.

Appellant also contends that its demurrer to plaintiffs' evidence should have been sustained, the contention being that the evidence presented a physically impossible situation in this: That the limb of the tree was too short to reach from the tree and fall on the wire, or if long enough it would not hit and break just one out of five wires, and then lie on the wire when it was on the ground. Without repeating the detailed facts as set forth in that argument, appellant includes therein statements and inferences favorable to it. In testing the sufficiency of evidence as against a demurrer, that is not correct. Rather, the rule to be followed is that recently stated in *Jones v. McCullough*, 148 Kan. 561, 83 P. 2d 669:

"In testing the sufficiency of evidence as against a demurrer, the court shall consider all of plaintiff's evidence as true, shall consider that favorable to plaintiff, together with all reasonable inferences to be drawn therefrom, and disregard that unfavorable to plaintiff, and shall not weigh any part that is contradictory, nor weigh any differences between his direct and cross-examination, and, if so considered, there is any evidence which sustains the plaintiff's case, the demurrer should be overruled." (Syl. ¶ 1.)

Under that rule, it may be said that plaintiffs' evidence showed the electric lines consisted of five separate wires, three at the top, two below, and that the middle top wire was the one which fell into the alley. About 26 feet west of the alley there was a maple tree in the Baptist church grounds; it was almost entirely dead. It stood almost 26 feet west of the alley and had a limb 33 feet long extending eastwardly so that it extended about six feet east over the alley line; that on the night in question there was a rainstorm, with some wind, and about midnight the mother heard a crash, went to a window and saw the limb of the tree lying across the alley. She returned to bed and a little later her daughter came and told her there was a dead man in the alley. Investigation showed it was the son. He had a wire in his hand and was afire. A number of witnesses testified the limb was on the portion of the wire leading to a pole to the north, and it was this piece with which the boy had come in contact.

As we understand appellant's claim of a physically impossible situation, it is that the limb could not fall from the tree and carry down the middle wire without involving the other wires and carrying some of them down. We are left to assume the middle wire was broken by the wind and that the limb afterwards fell on the wire as it lay in the alley. Perhaps it might be true that if the limb were so shaped and situated that when it fell it would strike the three top wires simultaneously, and if the three wires were all of equal strength, that all would break or none would break. It would seem that for that to be the situation would be unusual. Limbs of trees are not exactly straight, and wires along electric lines are not all evenly suspended. The evidence shows that the limb was heard to fall and in about fifteen or twenty minutes the boy was found in contact with the wire. There was evidence the wire was taut from the pole to where it was held on the ground by the fallen limb. We think it a fair inference from the evidence the limb struck first on the wire which broke, with the effect that the force of the fall was lessened and other wires were not broken and that the limb then continued downward holding the broken wire as described. Appellant makes some contention the city was without notice. The above-mentioned ordinance had been admitted and was some evidence the city recognized its duty to inspect its system to see it was not endangered by trees, and there was also evidence the limb had been dead for over a year. And if there was any error on this phase it

was cured by the city's evidence, for the superintendent of the light plant and also an electrician for the plant, while disputing plaintiff's evidence as to the size and reach of the limb, each stated he had been down the alley and had seen the limb while it was on the tree. For a discussion of a similar contention made under somewhat analogous circumstances, see *Seeley v. Board of Public Utilities,* 143 Kan. 965, 970, 57 P. 2d 471.

Appellant contends the city is not responsible for trees growing on private property. It also complains because the trial court would not permit it to show there were 7,500 trees growing in the city of Oswego. Whether all of these trees bordered electric light lines does not appear. The rejected evidence was not brought before the trial court on motion for a new trial, and the error, if any, is not now of consequence. In any event, it has not been made to appear that the question called for any answer material to the case.

Our attention is directed to various statutes dealing with trees and to our cases of *Swope v. City of Wichita,* 141 Kan. 388, 41 P. 2d 987, and *Turner v. City of Wichita,* 139 Kan. 775, 33 P. 2d 335, and especially to a portion of the syllabus in the last case reading:

"There is no liability, unless the condition of the tree or the limbs or branches thereof is so patently bad and has existed for such length of time that permitting them to remain is equivalent to an utter disregard of the safety of the traveler in the street." (Syl. ¶ 1.)

It is argued that the city has the power to remove a dead tree in the parking or to remove a dead limb from a tree in the parking, but has no responsibility for, or authority to cut, a limb from a tree standing on private property, and in that connection appellant cites *Durst v. Wareham,* 132 Kan. 785, 297 Pac. 675. In that case plaintiff sought to recover damages against the abutting property owner and also from the city when a motorcycle which he was riding down an alley struck an obstruction in the alley, causing the motorcycle to leave the alley and to strike and knock down a post supporting a roof, with the result the roof fell on plaintiff. It was there held:

"It is the duty of the owner of land adjacent to or abutting upon a highway to so construct and maintain the structures on his land as not to endanger the safety of travelers using the highway in a lawful manner." (Syl. ¶ 1.)

"A city is liable for injuries caused by a defective condition of its streets and alleys, but in order to render it liable its officers must have had some notice, either actual or constructive, of the defect, and they are not obliged to make an inspection of structures erected on land adjacent to or abutting

upon its streets and alleys to ascertain whether or not they are dangerous to travelers on the streets and alleys." (Syl. ¶ 5.)

It is to be noted that in that case the duties and liabilities of the city were with respect to its governmental functions. But in the case before us we are not dealing with the activities of the city in its governmental, but in its proprietary capacity. In its proprietary capacity the defendant was bound to the same degree of care in the maintenance of its electric light system as though it were an ordinary public utility. (See White on Negligence of Municipal Corporations, § 88, p. 122.)

A brief of *amicus curiae* has been filed which also treats the questions of trees and our various statutes respecting their care and protection. We deem it unnecessary to discuss such statutes. It is an incident in this case that defendant's wire was carried to the ground by the breaking of an overhanging dead tree limb. The question is not what the city might do with reference to its governmental duty to keep its streets safe for pedestrians; the question is what it should do to protect its municipal light plant conducted in its proprietary capacity, and was it guilty of negligence in failing to anticipate that the dead tree limb might fall and carry the electric wires, or some of them, to the ground? Had the system been owned by a private, as distinguished from a municipal, corporation, could it have successfully defended this action on the ground it had no right to remove the dead limb projected over its transmission lines? In our judgment the evidence disclosed a situation where the city was negligent in the maintenance of its electrical distribution system.

We shall not discuss appellant's complaint that material and competent evidence was excluded, for the reason the abstract does not show it was properly brought before the trial court on the hearing of the motion for a new trial.

Neither shall we discuss fully appellant's contention that the wire was broken by an act of God. Without reciting it, it may be said the appellant offered evidence which would have warranted such a conclusion. There was, however, evidence warranting a contrary conclusion, and the jury, having elected to believe that version, and the trial court having approved the verdict, the question is settled.

Appellant also complains that the trial court erred in overruling its motion for judgment on the answers to the special questions. Appellant filed no motion to set aside any answer to any special question, and its motion for judgment on the answers was a con-

cession on its part that the answers were supported by the evidence. (See *Witt v. Roper*, post, p. 184, 86 P. 2d 549, this day decided, and cases cited therein.) The complaint here made is that question number six, asking the jury to state acts of negligence, was answered, "At lack of proper supervision and unsafe maintenance of distribution system and the trimming and cutting of the tree." It is said no such ground of negligence was charged in the petition. As shown above, the petition disclosed plaintiffs' version of the factual situation and its charges of negligence. These allegations were followed by a recapitulation of negligence in three particulars, the first of which was—

"(1) In having and maintaining its high-voltage wire along the alley under the dead and rotten limbs, when the defendant knew or by the exercise of reasonable care could have known of the dangerous situation existing on account of said limb extending out over said wire."

Our conclusion is that the answer returned fairly finds negligence as above charged and that appellant's complaint is not well taken.

And finally, appellant contends the verdict is excessive. Summarized, the argument is that in the year preceding his death the son earned only $137, an amount not sufficient to support himself, leaving nothing which he could contribute to his parents, and that in such situation only nominal damages could be recovered. In support, appellant cites *A., T. & S. F. Rld. Co. v. Weber, Adm'r,* 33 Kan. 543, 6 Pac. 877; *Railway Co. v. Ryan,* 62 Kan. 682, 64 Pac. 603. In the Weber case the decedent left no wife, child, father or mother, none of his kin depended on him for support, and in a period of fifteen years he had given his next of kin, four brothers and a sister, "watch, clothing, and money, and holiday gifts." The verdict was for $400 and the question was whether even nominal damages could be recovered. It was held they could, this court saying:

"The claim of counsel for the defendant is, that notwithstanding the death of Weber may have been caused by the wrongful act or omission of the railroad company, yet as there was no actual damage or pecuniary loss sustained by his next of kin, not even nominal damages can be recovered. In this we think counsel are mistaken. The deceased was entitled to his life, and presumably the next of kin had some interest in his existence. A right of action is expressly given by the statute in behalf of the next of kin where the death of one is caused by the wrongful act or omission of another; provided the deceased, if he had lived, might have maintained an action for the injury caused by the same wrongful act or omission. The law infers an injury whenever a legal right has been violated, and every injury imports a damage." (p. 551.)

In the Ryan case a judgment for $5,000 was reversed. There the next of kin consisted of a brother, a sister and a nephew. There was no evidence the deceased had ever contributed in any sum or in any way to their support. It was said in that case:

"In the light of the evidence above summarized and the findings of the jury above quoted, it is not possible to sustain the judgment rendered in this case. It is not, however, a case of excessive damages given under the influence of passion and prejudice, and, therefore to be set aside under the statute, but it is a failure to make proof of substantial damages, and therefore to be set aside on the general principles of law. An action of the character of this one is purely compensatory. It is brought to recover for pecuniary loss consequent upon death. There being no legal liability resting upon M. J. McGlade to contribute to the support of his kinspeople, they can maintain the action only upon proof that he had contributed to them in some way, or had recognized his family obligation to do so and had manifested a disposition to discharge it. All the authorities are to this effect (citing cases)." (p. 687.)

The situation here presented is that of a minor son, to whose earnings the parents were entitled. It will be observed the jury, in answer to a special question, fixed the son's earnings just for the year before his death at $137. Just what weight they gave all of the testimony, we do not know. One of his employers said he had paid him $125. His mother said he had received $20 for playing in a band, and that he had worked in a filling station occasionally at fifteen or twenty cents an hour. She did not set any total for his earnings. There was evidence that he was a high-school graduate and a bright, energetic young man; that he had purchased an electric washing machine for his mother, had helped pay for an electric iron, had purchased some articles of furniture for his younger sisters, and had made some efforts towards getting a better place of abode for the family. The expenses of his funeral were over $425.

In *Aaron v. Telephone Co.*, 89 Kan. 186, 131 Pac. 582, where a verdict of $10,000 was reduced to $6,000, it was shown the deceased son was earning $1.50 or more per day which his mother kept for him and out of which he bought what he needed and she received a part. It was there said that mere comparisons are of little aid, and that in determining whether an allowance should be deemed excessive, each case turns upon its own peculiar facts. And attention is called to two cases, one where a verdict for $4,000 was sustained and one for $3,000 was held excessive.

In *Bradshaw v. Payne*, 111 Kan. 475, 207 Pac. 802, where the evidence as to the earnings of a seventeen-year-old boy was no more

sufficient than here, an award to his parents of $6,500 was held not to be excessive.

We shall not pursue the matter further. The evidence in the case warranted a judgment for more than nominal damages. It also showed the son had contributed substantially to his parents' support, even though the amount was not great. The court, after reviewing the record, concludes that the amount of the verdict does not show passion or prejudice on the part of the jury and that it is, in view of all the circumstances shown, not excessive.

The judgment of the trial court is affirmed.