No. 34,443

PEARL ELDREDGE, *Appellee* and *Cross-appellant* (PEARL ELDREDGE, as Guardian of MARAHELENE ELDREDGE, a Minor, *Plaintiff*), v. HARRY SARGENT and H. W. KNUPP AND SONS CONSTRUCTION COMPANY, *Appellants.* (D. J. HINES and HAROLD KNUPP, Partners doing business as HINES & KNUPP, *Defendants.*)

(96 P. 2d 870)

Opinion filed December 9, 1939.

*C. H. Brooks, Howard T. Fleeson, Carl G. Tebbe, Wayne Coulson, Paul R. Kitch,* all of Wichita, and *Roy J. McMullen,* of Great Bend, for the appellants.

*George W. Holland, Clifford R. Holland, Herbert N. Holland,* all of Russell, *Ezra Branine, Alden E. Branine, Fred Ice, Vernon A. Strobery,* all of Newton, and *Herbert Diets,* of Great Bend, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action by a widow to recover damages for the alleged wrongful death of her husband resulting from a collision of an automobile, driven by the deceased, with the rear end of a slowly moving truck. Judgment went for plaintiff, and the de-

fendants, Harry Sargent, the driver of the truck, and H. W. Knupp and Sons Construction Company, a corporation, owner of the truck, have appealed.

The plaintiff has cross-appealed from the order overruling her motion to set aside the verdict as to the amount only, which was in the sum of $3,500, and to grant a new trial on the single issue of damages.

Appellants contend the court erred in overruling their joint demurrer to plaintiff's evidence and their motion for judgment on the special findings. They further contend that, in any event, they are entitled to a new trial generally by reason of misconduct of counsel for plaintiff in the closing argument to the jury.

We shall first review the evidence against which defendants' demurrer was lodged. That evidence, in substance, was as follows:

The accident occurred as plaintiff was driving north on Kansas highway No. 1, then a graveled road, and at a point about two and one-quarter miles north of Plainville. Plaintiff was driving a 1935-model Plymouth car. It was in good condition. The lights on such a car illuminated the highway for a distance of about 400 feet with the dimmers, and about one-fourth of a mile when the bright lights were in use. The accident occurred at about one o'clock in the morning of October 3, 1936. The deceased was forty-two or forty-three years of age and in good health. The road was about thirty feet wide, which included a sand or gravel ridge on the east side about two and one-half feet in width. There was no mist, rain or anything of that sort. It was a clear, moonlight night. The truck in question was a Ford V-8, and contained a flat bed which was described as being seven feet, six inches wide, and also as being between seven and eight feet wide. The bed was about seven feet, ten inches long, and about four and one-half feet from the ground. The truck bed was loaded with implements used by defendants in excavating and digging slush ponds on oil leases. The implements consisted of a part of a bulldozer, being a blade and the arms which would be fastened to a tractor. That part of the bulldozer was described as containing an iron blade and arms, the combined length of which was ten feet and approximately four inches. It was about two and one-half feet high. The blade is fastened onto a caterpillar tractor by heavy steel arms, which hold the blade in front of the tractor. The blade was located immediately back of the truck cab. On the bed was also located a kilifer, which is described as

a wheeled tractor on the order of a plow. It is something like a lister, only it has five prongs. It appears the kilifer was located between the arms of the bulldozer. There was evidence the arms of the bulldozer extended two, three, four or five feet behind the bed of the truck. No flag was noticed on the arms before the accident. When they left the truck, after the accident, a flag was placed on the end of an arm and flares were then placed on the highway. The arms were located just about even with the west and east edges of the truck bed. The color of the truck and implements was variously described as "a little dark, a kinda dark, dark brown," and as having some mud on them, and as being a little dirty. The implements were also described as being dark yellow, not bright, and as having the color of old iron. The evidence described the reflectors, tail lights and clearance lights as being dirty, and as being covered with mud and dirt. None of the lights were burning at the time of the accident. The accident occurred on the east side of the highway and at a point about 300 feet north, or between 300 and 400 feet north, of a slight rise in the road. There was no other car or vehicle coming from the north and there was nothing to interfere with a car going around the truck. The truck was at all times on the east side of the road and there was more than one-half of the road between the truck and the west side of the side of the highway. After the collision the truck faced slightly toward the northwest, with the right front wheel located just west of the sand ridge and the right rear wheel just east of the sand ridge. The slope was gradual to both the north and south of the crest of the rise, but the ground sloped a little more abruptly to the north than to the south. The truck driver had experienced some trouble with the battery. A family by the name of Hilgers lived in a house a short distance west of about the crest of the hill. Bernard Hilgers observed the truck standing on about the crest of the hill when he came home in a car. He offered to assist the truck driver. At that time no flares were stationed on the highway, but the taillights and the other lights of the truck were then lighted. He and the truck driver pushed the truck. After the truck was started the truck driver got into the cab and Bernard continued to push the truck north along the east side of the highway. He was located just east of the rear truck wheel. The lights went off when they started the truck and were off while the truck was being pushed down the slope at a speed of approximately two miles per hour. The deceased came from the south at a speed of

about fifty miles per hour, maybe a little faster. Several of plaintiff's witnesses testified the accident occurred about 300 feet north of the crest of the rise, another testified it was at least 300 feet north, and still another that it occurred between 300 and 400 feet north of the crest. The Plymouth car struck the truck a little west of the rear center or at the left rear end. It went underneath the truck bed and shoved the housing and rear left wheel of the truck forward. The radiator and hood of the Plymouth were badly mashed and a part of the steering wheel was broken off. The windshield of the Plymouth was broken and about one-third of it was broken out. The opening or hole in the windshield was directly in front of the driver. The principal injuries sustained were to the head of the deceased. The hole in the windshield was caused by the left or west arm of the bulldozer. Bernard Hilgers, who was pushing the truck, did not hear any brakes applied by the driver of the Plymouth.

The most helpful evidence introduced by appellee which discloses what could be seen at night, looking north from the crest of the hill, was the evidence of Bernard Hilgers. The counter abstract of appellee narrates that testimony as follows:

"A car *coming over* the crest of the hill going north *cannot see* a car *plainly* on the highway one hundred *yards or more away*. A car couldn't be seen *plainly until you got to the top of the hill*. I have traveled it many times when I go home *at night* and you couldn't see a car there, at least the lights of the car, *until you get there ready to turn in the gate of my father's place*. . . .

"The top of the slope is just about east of the house or a little bit south of the house." (Italics ours.)

The witness further testified:

". . . If you stood on the crest of the hill looking north you would have no trouble seeing anything to the north. The crest of the hill is about 100 *yards* from the place where the accident occurred." (Italics ours.)

Appellant's abstract contains similar narrated testimony of the same witness, as follows:

"After you get to the crest of the rise, then a car *100 yards ahead is in full view*. When the deceased in this accident got to the crest of the hill *300 feet away* from the accident, *he had a full view of everything ahead*." (Italics ours.)

Bernard Hilgers further testified:

"At the time of the accident the truck was in motion. I was pushing on the rear portion, on the right side of the truck, about even with the rear wheel. The truck was on the right-hand side of the road. The road was about

thirty feet wide. It was a clear, moonlight night. I don't recall whether there was any wind or not. The road was a graveled highway. I saw the lights of the Eldredge car *flash for an instant.*

" 'Q. You saw the lights for an instant; did you observe whether or not that car deviated in any way from the straight line that it was pursuing *immediately prior* to the accident? A. Well, it looked to me like he tried to turn to the west to miss the truck, at least he hit the truck on that side.' " (Italics ours.)

Lafe Hilgers, the father of Bernard Hilgers, had seen the truck while it was standing at the crest of the hill, at a time when the lights on the truck were not burning, and by the moonlight could see that the truck was loaded with implements. He was then about thirty or thirty-five yards away from the truck. Other testimony introduced on behalf of appellee might be narrated, but it would not assist in obtaining a clear understanding of the facts and circumstances surrounding the collision.

Appellants contend the evidence clearly disclosed the deceased was guilty of contributory negligence and their demurrers should have been sustained. It is not necessary to pass on that contention in order to reach a decision. The court prefers to pass that question and to decide the case on the special findings. We have reviewed the evidence introduced on behalf of appellee, for the reason it greatly illuminates the special findings. It is not contended appellants' evidence strengthened appellee's case. The findings of the jury were:

"1. State whether the defendants' truck was in motion prior to and at the time of the collision. A. Yes.

"2. If you answer question No. 1 in the affirmative, state at what rate of speed it was moving. A. Two miles an hour.

"3. State at what rate of speed the deceased was driving as he approached the truck. A. About 50 miles an hour.

"4. Did the deceased reduce his speed before striking the truck? A. Yes.

"5. State whether the rear lights of the truck were burning immediately before the collision. A. No.

"6. State whether there was anything to obstruct the view of the *deceased* along the road toward the north for a distance of 400 feet after he reached the crest of the rise in front of the Hilgers house. A. No.

"7. At what distance from the truck, in feet, could the deceased, in the exercise of ordinary care, by the use of the headlights on his car, first distinguish the truck ahead of him on the highway? A. One hundred feet.

"8. From the point where you find that the deceased could, by the exercise of ordinary care, have first seen the truck in the highway and *at the rate of speed the deceased was going at the time,* could the deceased, in the exercise of ordinary care, have turned to the left and passed the truck in safety? A. No.

"9. If you answer question No. 8 'no,' state what prevented him from passing the truck safely. A. Lack of time.

"10. From the point where you find that the deceased could, by the exercise of ordinary care, have first seen the truck in the highway, *and at the rate of speed the deceased* was going at the time, could he, in the exercise of ordinary care, have stopped his car and avoided the collision? A. No.

"11. If you answer question No. 10, 'no,' state what prevented him from stopping in time to avoid the collision. A. Lack of time.

"12. At the rate of speed at which you find the deceased was driving *immediately before the collision,* in how many feet could the deceased have stopped his car? A. One hundred and sixty feet.

"13. State whether it was a clear, moonlight night, when the collision occurred. A. Yes.

"14. Do you find from the evidence that the deceased, *immediately before the collision* was driving in a reasonable, prudent manner and keeping close watch of the highway ahead of him? A. Yes.

"15. If you find that the defendants were guilty of any negligence, which proximately caused the collision, state fully what such negligence was. A. No warning signals." (Italics ours.)

Appellants originally moved to have findings numbered 4, 8, 9, 10, 11, 12 and 14, set aside upon the ground they were contrary to the evidence, inconsistent with each other, and were unsupported by any evidence. The motion was overruled, and while that ruling is embraced in the specifications of error, appellants do not press that ruling now. Of course, their motion for judgment on the special findings notwithstanding the general verdict concedes, for the purpose of that motion, that the findings are sustained by the evidence. (*Webb v. City of Oswego,* 149 Kan. 156, 162, 86 P. 2d 553; *Witt v. Roper,* 149 Kan. 184, 187, 86 P. 2d 549.) Appellee admits finding number 7 is not supported by evidence, but she made no objection thereto at the trial. On the other hand, appellee affirmatively approved every part of the trial below which touched the subject of liability when she dismissed her motion for a new trial generally and specifically asked for a new trial only on the single element of damages. Just how the jury made answer number 7, in view of the clear testimony of appellee's own witnesses to the effect that the truck could have been seen by the deceased after reaching the crest of the hill, is not easy to understand. Especially is that true in the absence of any evidence that the rays of light from the Plymouth car would have been thrown under the truck bed. Of course, the lights could not possibly have been thrown under the truck bed at all times, if in fact they were at all, because they inevitably covered the entire truck and load at some time after the Plymouth passed

the crest of the hill. According to the evidence the lights illuminated the road 400 feet ahead even if only the dimmers were in use, and a much greater distance if the bright lights were in use. In view of the record, however, this court is bound by the findings as they stand, and we shall so accept them. In connection with finding number 7, it is well to note that the jury did, however, specifically find there was nothing to obstruct the view of the deceased to the north for a distance of 400 feet after deceased reached the crest of the rise (finding No. 6), and that finding clearly conforms to appellee's own evidence that the truck could have been seen at night by the deceased after he reached the crest of the rise; 400 feet clearly embraced the most distant location of the truck from the crest of the hill.

It is not contended the truck was not on its proper side of the road at all times. In fact, more than half of the road remained between the truck and the west side of the highway. The negligence pleaded was that the truck was parked on the highway in the nighttime without the proper lights, flares, reflectors or warning signals to warn approaching traffic of the truck, or load upon the truck, so parked. The truck was not parked on the highway at any time material to this action. The jury found against appellee on the charge the truck was parked (finding No. 1). That it was not parked, but was moving, is now conceded. The absence of warning signals is now conceded to have been appellants' only negligence (finding No. 15). By that finding the jury absolved appellants of all other negligence charged. Since the truck was moving, the negligence is limited to the absence of those warning signals which should have been on the truck or load. By finding number 15 the jury said "no warning signals," was the proximate cause of the collision. If that was not the proximate cause of the collision then there can be no recovery against appellants, even though appellants were negligent in failing to have warning signals on the truck or on its load. The jury specifically found the deceased could have distinguished the truck, without any warning signals, when he was still 100 feet away from it (finding No. 7). In contemplation of law the deceased therefore did see the truck when he was 100 feet away. Where the absence of lights or warning signals does not prevent a driver from seeing a vehicle in time to avoid it, the absence of lights or signals cannot be said to be the proximate cause of the collision. (*Anderson v. Sterrit,* 95 Kan. 483, 148 Pac. 635; *Cothran v. Cleenewerck & Son,* 235 Mich. 351, 209 N. W. 132; *Amey v. Erb,* 296 Pa. St. 561, 146

Atl. 141.) See, also, *McCausland v. File*, 141 Kan. 120, 121, 122, 40 P. 2d 323, and cases therein cited. In the *Cothran* case, *supra*, the same principle was involved where the defendants saw the unlighted car of the plaintiff when only six rods (99 feet) away and ran into it. The court said:

"In their brief counsel for the defendants argue that the plaintiff was guilty of contributory negligence. It does not appear that there was anything the plaintiff could have done to stop the defendant from running into his truck. The absence of a tail light had nothing to do with it. The defendant Blanchard saw the truck when he was six rods away, in ample time to avoid hitting it. His negligence in failing to act as an ordinarily prudent man would have acted under the circumstances was the sole cause of the plaintiff's injuries." (p. 354.)

In *Barnhardt v. Glycerin Co.*, 113 Kan. 136, 213 Pac. 663, it was said:

"It is well settled that where the act found as negligence did not cause the injury complained of there can be no recovery. (*Railroad Co. v. Justice*, 80 Kan. 10, 101 Pac. 469)." (p. 141.)

It is true, finding number 7 does not say the deceased saw the short projection which extended beyond the truck bed. In the instant case, however, the deceased did not only run into the projection, which under the evidence most favorable to appellee extended only five feet beyond the end of the truck bed, but he actually ran into and underneath the truck itself, which he could have distinguished, and in law is held to have seen, when 100 feet away. We are bound not only by that fact but by the further highly important and undisputed fact relative to the location of his own car immediately before the collision. At that instant, just before the collision, the deceased was so close to the truck and so far to the east on the highway that when struck by the west projection he obviously could under no circumstances have missed striking the truck itself. This must inevitably be true, because the projection entered the left or west part of the windshield, which left the main portion of his car entirely to the right or to the east of the projection. When the car was that far to the east, and when the projection was passing through the windshield in front of decedent, the front part of his car necessarily was already under or was passing under the truck bed. It follows that any attempt by deceased to pass around the truck could not have been made when he distinguished the truck 100 feet away, a distance of one-third of an ordinary city block, but was made entirely too late to miss the truck. The conduct of the deceased, under facts which must be conceded,

constituted contributory negligence as a matter of law, and we simply cannot escape that conclusion. Finding number 8 was supported by no evidence, but accepting it as it stands constitutes a pure conclusion which is contrary to the common knowledge of every driver of an automobile. Furthermore, that finding is based upon the speed deceased was traveling. If he was traveling so fast that he could not turn to the left and pass the truck in safety when seeing the truck 100 feet away, he certainly was not exercising ordinary care. The truck was entirely on its right side of the road. More than one-half of the road remained between the truck and the west side of the highway. There was no other traffic, no obstruction to his view, or anything else to prevent him from turning to the left in ample time to miss both the truck and the short projection. No part of the projection extended across the center of the highway. Finding number 9 is based on finding number 8, and certainly discloses the deceased did not have his car under proper control if he did not have time to pass the truck on the left when he saw it 100 feet away. Findings numbered 10, 11 and 12 pertain to the subject of stopping. They should be considered together with findings 3 and 4, which latter findings affected his ability to stop. Finding number 3 shows deceased approached the truck at fifty miles per hour. Finding number 4 discloses deceased reduced his speed before striking the truck. We find no evidence whatever to support the latter finding, but here again we shall accept that finding as made. To what extent deceased reduced his speed is not disclosed, with the result that the finding is not very helpful, if in fact helpful at all. Whatever the reduction in speed may have been the jury specifically found that *immediately before the collision* the deceased was traveling so fast that it would still have required 160 feet to stop. That speed undoubtedly accounted for the fact the deceased struck not only the projection, but the truck itself, with great force. Such speed violated the well-established general rule that it is negligence as a matter of law for a motorist to drive an automobile at night at such speed that it cannot be stopped within the distance objects can be seen ahead of it. (*Jones v. Atchison, T. & S. F. Rly. Co.*, 129 Kan. 314, 282 Pac. 593; *Berry v. Weeks*, 146 Kan. 969, 73 P. 2d 1086, and cases therein cited.) Under the findings which are not general but specific in character we are forced to conclude the deceased either did not correlate his speed and ability to stop with his ability to see, or he didn't look. Finding

number 14 attempts to relieve deceased of all negligence *immediately before the collision*. It will be observed the jury was not asked whether the deceased attempted to pass the truck on the west. But let us assume for the moment that he did make such attempt, immediately before the collision. If "immediately before the collision," was intended to refer to the time when deceased may have tried to turn to the west, it was of course then too late to exercise diligence. If an emergency existed at that late moment it was created by the negligence of the deceased in failing to turn out when he had ample time to do so, or by the concurrent negligence of deceased and appellants. Under such circumstances the emergency doctrine cannot be invoked. (*Barnhardt v. Glycerin Co.*, 113 Kan. 136, 138, 139, 213 Pac. 663; 45 C. J., Negligence, § 519.) It is, however, sufficient to say that no emergency was pleaded in the instant case. The deceased could not have exercised the care described in finding 14 and yet have run into the truck as the undisputed evidence discloses he did run into it. Furthermore, finding number 14 is general and in the nature of the jury's conclusion drawn from facts found in detail, which detailed facts established contributory negligence as a matter of law. The conclusion must yield to the detailed findings. (*C. B. U. P. Rld. Co. v. Henigh, Adm'r.*, 23 Kan. 347, 359; *A. T. & S. F. Rld. Co. v. Plunkett, Adm'r.*, 25 Kan. 188; *Railway Co. v. Laughlin*, 74 Kan. 567, 87 Pac. 749; *Maris v. Street Railway Co.*, 98 Kan. 205, 158 Pac. 6; *Koster v. Matson*, 139 Kan. 124, 30 P. 2d 107.) Where the special findings are inconsistent with the general verdict and cannot be reconciled therewith, the general verdict must fall. (*Carlgren v. Saindon*, 129 Kan. 475, 479, 283 P. 2d 620; *Diehl v. Barker*, 137 Kan. 255, 20 P. 2d 534; *Koster v. Matson*, supra; *Berry v. Weeks*, supra.) Here the special findings, which are not general but specific in character, disclose the absence of warning signals was not the proximate cause of the collision and that deceased was guilty of contributory negligence as a matter of law.

The industry of counsel for the respective parties has resulted in collecting probably every decision of this court dealing with exceptions to the well-established general rule that it is negligence as a matter of law for a motorist to drive an automobile at night at such speed that it cannot be stopped within the distance objects can be seen ahead of it. Many of the decisions involve a demurrer to evidence. They therefore involve presumptions and inferences which

cannot be indulged on a motion for judgment *non obstante veredicto.* In support of the contention that the motion for judgment on the special findings was properly overruled, appellee cites: *Barnhardt v. Glycerin Co.,* 113 Kan. 136, 213 Pac. 663; *Barzen v. Kepler,* 125 Kan. 648, 266 Pac. 69; *Deardorf v. Shell Petroleum Corp.,* 136 Kan. 95, 12 P. 2d 1103; *Sponable v. Thomas,* 139 Kan. 710, 33 P. 2d 721; *Chance v. Murry,* 143 Kan. 476, 54 P. 2d 981; *Watson v. Travelers Mutual Cas. Co.,* 146 Kan. 623, 73 P. 2d 64; *Long v. American Employers Ins. Co.,* 148 Kan. 520, 83 P. 2d 674; *Frakes v. Travelers Mutual Cas. Co.,* 148 Kan. 637, 84 P. 2d 871.

We have reëxamined not only the above cases, but also what has been said in the numerous decisions cited by appellee under her treatment of the demurrer to the evidence. The instant case turns on the special findings, which have been analyzed, and which the court, upon due deliberation, has concluded do not bring the instant case within any exception to the well-established general rule. Holding this view, it becomes unnecessary to treat other contentions made by either of the parties. It follows the judgment must be reversed, with directions to enter judgment for appellants. It is so ordered.

Harvey and Smith, JJ., dissent.