No. 35,525

MRS. ANNA WRIGHT, *Appellee*, v. THE NATIONAL MUTUAL CASUALTY COMPANY OF TULSA, and RAY C. GORDON, *Appellants*.

(129 P. 2d 271)

Opinion filed October 3, 1942.

*I. H. Stearns,* of Wichita, argued the cause, and *C. A. Matson* and *E. P. Villepigue,* both of Wichita, were on the briefs for the appellants.

*F. W. Prosser,* of Wichita, argued the cause for the appellee.

The opinion of the court was delivered by

ALLEN, J.: Anna Wright brought this action to recover damages for the wrongful death of her son, Howard Wade Wright. Plaintiff's son was killed when the automobile in which he was riding struck the livestock truck of defendant Gordon. The insurance carrier of

Gordon was joined as defendant. The appeal is from a judgment in favor of plaintiff.

The collision resulting in the death of young Wright occurred about two and one-half miles east of the town of Mullinville. At Mullinville, U. S. highway No. 154 coming from the northwest and U. S. highway No. 54 coming from the southwest unite and run east as one road. East of Mullinville the highway is designated as U. S. highway No. 54.

The accident occurred at about 7:45 in the evening of February 19, 1940. Plaintiff's son was riding in a Dodge car belonging to and being driven by Carl C. Maurer. Wright and Maurer were friends and lived in Freona, Tex. They had left Freona about noon of February 19, to drive to Wichita. Wright and Maurer had driven over highway No. 54 from the southwest to Mullinville and were proceeding eastward from that town. Defendant Gordon approached Mullinville on highway No. 154 from the northwest and had proceeded eastward evidently a little ahead of the Maurer car.

When the Gordon truck had gone about two and one-half miles east of Mullinville it came to a place where a snowbank had been on the highway and where only one lane of traffic had been cut through. Gordon stopped his truck with the right wheels off the black-top pavement to allow cars that were approaching from the opposite direction to pass. Before these cars reached the truck, the Maurer car came up from the rear and struck the left-hand rear corner of the truck with the top of the right side of the Maurer car's windshield. Howard Wade Wright, riding in the right-hand side of the front seat as a passenger in the Maurer car, was injured and died shortly thereafter.

The petition set forth the above facts and alleged that the truck driven by defendant Gordon was a 1938 Ford truck with a stock or stake body constructed and built out of lumber; that the lumber and body were neutral in color and unpainted in any distinguishing manner; that the truck was negligently parked on the highway with the right wheels just off the edge of the slab and the major portion of the truck on the highway; that the rear of the truck was not properly marked by lights or marker lights or with lights as required by the statutes and the rules and regulations of the state corporation commission, and that the death of Wright was caused by the negligence and carelessness of Gordon in the particulars named.

The petition alleged that plaintiff's son was twenty-eight years of

age and was earning eighty-five dollars per month and that he contributed in a material way to plaintiff's support; that he had agreed to furnish plaintiff with a home and to take care of her, and that by reason of the negligent acts of defendant Gordon, plaintiff had lost her expected home and financial assistance.

Defendants in their answer alleged that Howard Wade Wright and Carl C. Maurer were guilty of contributory negligence in operating the automobile at a high and dangerous rate of speed, and in driving at such a rate of speed that they were unable to stop the car within the range of vision of the lights of their automobile. It was also alleged that Wright and Maurer were engaged in a joint venture and that the negligence of Maurer, the driver of the automobile was, under the law, imputed to Wright.

The issues were submitted to a jury. The jury gave its verdict in favor of the plaintiff in the sum of $3,000, and returned answers to special questions.

In answer to special questions the jury found that Howard Wade Wright had planned to furnish plaintiff with a home and that after his father's death had contributed $780 to plaintiff; that defendant Gordon had "no identification lights at top of truck at rear," and that such failure constituted negligence which caused the death of Wright; that the truck was of such color that it had a tendency to blend with the highway and could not be distinguished until an approaching truck was almost to it; that at the time Maurer first saw the truck he was driving between 45 and 50 miles per hour; that at or immediately prior to the collision Wright exclaimed "look out"; that "failing to see the truck in time" prevented Maurer from stopping his car before reaching the truck; that Maurer was 40 or 50 feet from the truck when he first observed it, and that he applied his brakes at that time; that the lights on the rear of the truck were burning immediately prior to the collision; that Wright was not guilty of any negligence which was one of the proximate causes of the accident; that Maurer, at the rate of speed at which he was driving, could not, in the exercise of ordinary care, have passed the truck in safety; that it would take Maurer, after first seeing the truck, one second to apply his brakes, and that driving at a speed of 50 miles per hour, under the condition of the pavement, he could have stopped his car within 150 feet after his brakes were applied. The jury found that in exercise of ordinary care it was necessary for defendant Gordon to stop his truck and that he had stopped one minute prior to the collision. The jury further found:

"15. From what point on the highway could 'Carl Maurer and Howard Wade Wright have, by the exercise of ordinary care, first seen the truck on the highway? A. 100 feet.

"17. State the distance Carl Maurer could under the exercise of ordinary care have observed objects at night with dimmers turned on. A. 200 feet."

As shown in the abstract, Maurer, driver of the automobile, testified:

"It was customary to do that—and was watching the road directly ahead of me and didn't see anything at all—wasn't worried and Wade cried 'look out!' and of course, I tried to see what to look out for and in an instant I saw the truck. Of course, I saw all of this in an instant because I just had an instant, and I whipped to the left to try to miss it. His right rear duals were just off the pavement. I couldn't possibly go to the right because I didn't have enough room but I did have a little extra room on my left-hand side. I whipped to the left and thought I had missed him, but the left-hand edge of his bed caught the right-hand corner of my windshield about three inches back from the corner—and took a slice out of it and went on back. It was the right-hand side of my car. I had put my dimmers on about three hundred yards back. It would be hard to give a description of the back of the truck in the short length of time I had. I had to see it all at one time and make up my mind. I could see the cluster of three tail lights or whatever you call them, signal lights, on the left-hand side of the one here. I could see that the right rear duals were just off the pavement. It was a dirty gray color was about all I could make up my mind about as far as color is concerned. When I saw the cluster of lights I didn't see the tail light on the rear of the truck. I didn't see any lights when I first observed it and as I approached, from the time I put on my dimmers, I didn't observe any red lights ahead or marker lights or flares of any kind. All I know is when I stopped, the front of my car was pointing northeast at about 45 degree angle to the highway, and as to the north and south and center of the road, it was practically in the center. The truck was directly to my right. That is, the back of the truck was about even with the front of my car.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Immediately prior to the accident, when I put my dimmer on, I was going between 50 and 55 miles. The condition of the highway had been good. Had not noticed any snowbanks or ice. My lights were good, brakes were good. I had had them fixed about two months before. The cars that were meeting had not passed at the time the collision occurred. I can't state exactly how long it was before they passed us, but two minutes or a minute, you don't know exactly in a case like that. As to the length of time it was that Wade cried 'look out!' before the accident, it was just a split second. I would say we were some forty or fifty feet away when Wade said 'look out!' He was riding with me on the right-hand side of the car, on the front seat. I don't know what highway we were coming to. The highway was perfect as far as driving was concerned. There had been no snow on it, nor any ice that we had noticed. I hadn't noticed any ice up to the point of accident that night. There was nothing to indicate that the highway was blocked ahead. We had

not heard any weather reports or warnings to the effect that the highway was blocked.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. What, if anything, Mr. Maurer, prevented you from seeing that truck as you came up there, or noticing something ahead of you on the highway?

"A. Well, the only thing that I could reason—know why I could reason it out was that it didn't have any lights. I had been driving from 55 to 57 miles per hour. That is my average speed all the time.

"Q. Were you, in your opinion, driving about that same speed immediately prior to the accident?

"A. Well, I suppose as a rule you slow down a little after dark, but I wouldn't attempt to say that I had slowed down ten miles or five miles. I know it wasn't any faster than that. I doubt if we were going over fifty miles an hour when we saw the wreck—I mean when we saw the truck."

On cross-examination Maurer testified:

"I don't think there was a moon, but it wasn't cloudy. I saw the cars coming through the lane and put my dimmers on. I don't know how far my lights would show with the dimmers on. I would say I could see from 100 to 200 feet, but I can't say exactly the distance. I would not even say it approximately. In other words, I don't know and didn't know that night how far you could see. I had been driving from fifty to fifty-seven miles per hour, which is my ordinary speed and the reason I said I was going approximately fifty miles an hour was that as a rule if you are meeting cars you will slow down some, and my judgment is fifty miles an hour when I first saw the truck. That is, when I was forty feet from it. When my dimmers were on my lights would throw the light down and to the right and the whole pavement wasn't lighted up. The right-hand side is brighter than the left. I don't know how far down the pavement I could see an object as big as a truck."

The defendant Gordon testified:

"On the back is a cluster of three lights, about a foot and a half or two feet long and three lights connected on this cluster, about six or eight inches apart. They were small lights. These were on the left-hand corner. They are called identification lights. They are at the bottom of the truck. Also on the back of the truck there were two clearance lights on each corner and a tail light. The clearance lights are little lights fastened to the sill of the truck down at the bottom of the truck, and then there is a tail light underneath which makes six lights on the rear, and in front I had two lights and the clearance light and a cluster fastened on the cab. These lights were all on one switch."

The jury found the defendant Gordon was guilty of negligence in failing to have identification lights at the top of the truck at the rear. It is well settled that where the act found as negligence did not cause the injury complained of there can be no recovery. (*Railroad Co. v. Justice*, 80 Kan. 10, 101 Pac. 469; *Barnhardt Glycerin*

*Co.,* 113 Kan. 136, 213 Pac. 663.) It is equally well settled that where the absence of lights or signals does not prevent a driver from seeing a vehicle in time to avoid it, the absence of lights or signals cannot be said to be the proximate cause of the collision. (*Eldridge v. Sargent,* 150 Kan. 824, 830, 96 P. 2d 870, and authorities there cited.) It is also established that where a person drives an automobile along a highway on a dark night at such speed the car cannot be stopped or turned aside within the range of vision of the lights on his car, such person is guilty of negligence as a matter of law. (*Haines v. Carroll,* 126 Kan. 408, 267 Pac. 986.)

We find no testimony to support the finding that the car driven by Maurer was traveling between 45 and 50 miles per hour. He had been traveling at between 55 and 57 miles per hour until immediately before the accident—he was forty or fifty feet from the truck when Wright cried "look out!" The testimony reveals that Maurer was traveling at a speed of at least 50 miles per hour when he was forty feet from the truck. In this state of the record can it be urged that the legal cause of the death of Wright was the absence of the rear top lights on the rear of the truck? No doubt the condition of the highway, the atmospheric conditions—visibility at the time—must be taken into consideration.

The jury found that Maurer, driving at a speed of fifty miles per hour, could stop his car within 150 feet after applying his brakes. Upon the question as to the distance within which the driver of the car, in the exercise of ordinary care, could have seen the truck, the answers to questions 15 and 17 are in irreconcilable conflict. Where important special findings of fact made by a jury are wholly inconsistent judgment on the verdict cannot stand. In such case the judgment will be reversed and the cause remanded for a new trial. (*Dunlap v. Railway Co.,* 93 Kan. 50, 143 Pac. 415; *Crissey v. Loan Co.,* 59 Kan. 561, 53 Pac. 867; *Cole v. Railway Co.,* 92 Kan. 132, 139 Pac. 1177.) The distance in which the truck could be seen by Maurer and Wright was important, and on that point the answers to questions 15 and 17 were wholly inconsistent.

Under the authorities cited the judgment must be reversed with directions to grant a new trial. It is so ordered.