No. 44,132

JOHN H. DEEMER, JR., *Appellee,* v. GLENN E. REICHART, *Appellant.*

(404 P. 2d 174)

Opinion filed July 10, 1965.

*Donald Patterson,* of Topeka, argued the cause, and *David H. Fisher, C. K. Sayler, Jack L. Summers, Edwin D. Smith, Robert L. Webb, Ralph W. Oman, Philip E. Buzick, William B. McElhenny, James D. Waugh, James L. Grimes, Jr., Donald J. Horttor,* and *Terry L. Bullock,* all of Topeka, were with him on the brief for the appellant.

*Terence D. O'Keefe,* of Atchison, and *Jack H. Greene,* of Wichita, argued the cause, and *Maurice P. O'Keefe, Steadman Ball, Dolan McKelvy, Maurice P. O'Keefe, Jr.,* all of Atchison, and *Dale Kidwell, George W. Ball,* and *Kenneth M. Nohe,* all of Wichita, were with them on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: Plaintiff brought this negligence action against defendant to recover damages for injuries sustained by him when he

drove into the rear of defendant's cattle truck parked partially on the highway at dusk.

In his petition plaintiff charged the defendant with negligence in parking the truck in the main-traveled portion of the highway, in failing to properly illuminate the taillights on the truck or to display other warning signals, and in failing to maintain a proper lookout for plaintiff's automobile.

In his answer defendant denied these charges of negligence and, for our purposes pertinent here, charged that plaintiff was guilty of negligence contributing to cause the collision in driving at a speed that would not permit him to stop or turn aside within his range of vision, in failing to keep a proper lookout and in failing to pass defendant's truck on the left and thus avoid the collision.

On issues thus joined, trial was had to a jury which returned a general verdict for plaintiff and against defendant along with answers to special questions finding defendant guilty of negligence that was a proximate cause of plaintiff's damages and absolving plaintiff of any contributory negligence and itemizing plaintiff's damage as follows:

"(a) Past pain and suffering............................... $6,250.00
"(b) Future pain and suffering............................ 6,250.00
"(c) Past loss of wages.................................... 4,200.00
"(d) Future loss of wages................................. 19,750.00
"(e) Injuries ............................................ 10,000.00
"(f) Damages to his automobile........................... 1,252.50
"(g) Past medical bills................................... 3,208.15"

At the trial at the close of plaintiff's evidence defendant moved for dismissal on the grounds that upon the facts and the law the plaintiff had shown no right to relief and he also moved for a directed verdict on the ground that plaintiff's evidence showed him guilty of contributory negligence as a matter of law. These motions were overruled. At the close of all the evidence defendant renewed his motion for directed verdict upon which the trial court reserved its ruling. After the jury verdict against him defendant moved to set it aside and to enter judgment in accordance with his motion for a directed verdict, or in the alternative for a new trial. The trial court overruled all of these motions and entered judgment on the jury verdict, from all of which defendant has perfected his appeal to this court. With one exception the points relied upon for reversal concern the correctness of the trial court's rulings during

the trial and presented again at the hearing of defendant's post-trial motion.

The locale of the collision was Kansas State Highway 116 between the small towns of Larkinburg and Arrington. The impact occurred one-half mile east of the east city limits of Larkinburg and about 500 feet west of the Elk Creek bridge. The eastern city limits of Larkinburg are at the bottom of a small hill or rise on which the town buildings are situated. The roadway running east and west between the city limits and the Elk Creek bridge was blacktop, twenty-four feet wide, straight, flat and dry with no feature affecting the vision of an eastbound driver headed east from Larkinburg toward and beyond the Elk Creek bridge. East of the bridge the road curves to the south, then to the east to the town of Arrington, approximately one-half mile from the Elk Creek bridge.

There were three eyewitnesses to the collision and events immediately preceding it—plaintiff, defendant and one Winston Wheeler. Although not an eyewitness one Robert A. Ireland arrived at the scene of the collision almost immediately thereafter, driving westward from the town of Arrington, and his presence on the highway figures somewhat in the testimony.

While there was some dispute in the evidence, particularly with reference to certain inferences to be drawn therefrom, the evidence viewed in the light most favorable to the plaintiff as the prevailing party, as it must be, showed substantially the following concerning the collision:

On the afternoon of the collision, March 26, 1963, defendant, a cattle buyer, had purchased some cattle in Holton for Winston Wheeler, who lived in Larkinburg. Defendant loaded the cattle, weighing 9,180 pounds, into his truck, a 1960 Ford two-ton truck, with rear dual wheels, an eight foot high stock rack, and a bed approximately eight feet wide, and left Holton at about 6:10 or 6:15 p. m. and drove to the Wheeler residence at Larkinburg. Not finding Wheeler, defendant started east out of Larkinburg on highway 116 toward Arrington, at which time he testified he could see as far as the Elk Creek bridge. Proceeding eastward he recognized Wheeler's truck approaching toward him and signaled him to stop for the purpose of telling him about the cows he had bought for him. Wheeler, whose truck was empty, pulled completely off the road onto the shoulder, headed west with his headlights burning. Defendant pulled to his right until his right rear dual wheels were on the grassy shoulder, which was soft, with the left rear dual

wheels on the highway. The truck was tipping to the right. Wheeler described the light condition as dusk. Wheeler and defendant each stated that defendant did not have his headlights on. On direct examination each testified that defendant had his red clearance lights on. When asked about an allegedly inconsistent statement he made to a highway patrolman soon after the collision, Wheeler testified:

"A. I don't remember the night of the accident, I don't remember a whole lot about the statement that I gave the highway patrol. The questions he asked, I don't remember the definite questions. It was difficult to remember about the accident, was about a year."

On cross-examination defendant also gave inconsistent testimony as to whether his clearance lights were on, testifying he could not state for sure whether his lights were on or off and that the patrolman stated the truth. The two trucks were parked about 125 to 130 feet apart. Defendant walked to the Wheeler truck and conversed with Wheeler. Wheeler wrote out a check and checked it in his headlight beam. Wheeler and defendant noticed a pair of eastbound headlights (plaintiff's car) west of Larkinburg and then later a pair of westbound headlights (Ireland's car) coming toward them out of Arrington. Defendant testified plaintiff slowed down through Larkinburg. He further testified he was listening to both cars and he thought he had plenty of time to get to his truck to move it down the road. Then defendant, being worried "there will be three cars here at one time," turned and ran as fast as he could with the intention of getting in his truck parked in the eastbound lane. Wheeler testified he climbed in his truck and flashed his headlights on and off at plaintiff's vehicle which continued eastward until it collided with the rear of defendant's truck. Defendant ran eastward until he reached a point six or eight feet west of his truck when he jumped into the ditch on the right side, just before the impact.

Plaintiff, a salesman for a bowling equipment company, had left Holton at approximately 6:45 p.m. He had fastened on his safety seat belt before leaving. Between Holton and Larkinburg he turned on his headlights. He drove between thirty-five to forty miles per hour through Larkinburg, proceeding eastward down the hill out of Larkinburg to a speed of about sixty to sixty-five miles per hour. He described the visibility as "darkness" and "dirty dusk." He was looking ahead. He did not remember whether he had his high headlights on or his low beam lights. He saw a man

between his car and the rear of the truck dive for the ditch. He further testified:

"A. Saw a man in a truck in the middle of the highway and a man and I saw a man diving for the ditch and I evidently was in a skid at this time because I run into the truck.

"Q. Do you remember whether you saw the man first or the truck first or what is the thing that you saw at this particular time?

"A. Seemed to happen at the same time. Saw the man and the truck together.

"Q. Do you know how far you were from this man and truck at the time that you saw it—them?

"A. I have no idea.

"Q. Do you remember what you did at the time that you first saw them?

"A. Evidently applied my brakes.

"Q. Do you have any independent recollection of applying your brakes?

"A. No, sir. I think it was an automatic thing. I don't remember actually applying the brakes.

"Q. Do you remember whether this truck was in your lane of travel or not?

"A. It was dead center, yes, sir.

"Q. Do you remember seeing any other truck on the highway between the time that you left Larkinburg until you hit this truck?

"A. No, sir.

"Q. Do you remember seeing any lights blinking or anything like that?

"A. No, sir.

"Q. Do you have a real clear recollection of everything that happened at that particular time?

"A. Not completely, no, sir.

"Q. Do you remember seeing any flares out on the highway?

"A. No, sir. There were none.

"Q. Do you remember seeing any flags of any kind?

"A. No, sir.

"Q. Do you remember seeing any lights on this truck prior to the time that you hit the truck?

"A. No, sir, I do not.

"Q. Do you remember seeing a man dive for the ditch?

"A. Yes, sir.

"Q. Do you know how far he was from the truck at the time that he dived for the ditch?

"A. I have no idea. Looked like I was right on top of them.

"Q. Do you know approximately what time this occurred?

"A. I think it was around 7:10."

(Sunset was stipulated as being at 6:40 p. m.)

Plaintiff didn't actually remember the impact. He also testified:

"Q. You have no recollection of seeing the truck at all?

"A. Never until it loomed before me.

"Q. How—you say it did loom before you just prior to the impact?

"A. Yes, sir.

"Q. I want to ask you some questions about that moment of time. At that time, was the truck at the outer extremity of your headlight beam?

"A. That, I cannot tell you, sir. I don't know.

"Q. You don't know?

"A. I don't know.

"Q. You had not noticed it before?

"A. Not prior to it, no, sir.

"Q. The truck was in this position, was it?

"A. Not—I didn't see it, I don't know.

"Q. You didn't see it? You didn't have a chance to see it long enough to determine whether or not it was in motion, did you?

"A. If I did see it, I couldn't determine whether it was in motion or not.

"Q. Could you determine whether there were any lights on it?

"A. I don't remember any myself.

"Q. I see. Did you have a chance to see it long enough to really determine whether or not any lights were burning on it?

"A. Possibly not, I don't know.

"Q. Very short period of time, didn't you, Mr. Deemer?

"A. Yes, sir.

"Q. Just a very short—now was it just kind of a flash?

"A. Well, little longer than that, but it was pretty fast.

"Q. Didn't have time to guide your car to the left, did you, at the time you saw it?

"A. No, sir.

"Q. At the time that you saw this, you said that you saw a man?

"A. Yes, sir.

"Q. Is this the first time you had seen a man?

"A. Yes, sir."

The man was in motion.

"Q. Do you have any estimate or judgment of how far you were away from the man when you first saw him?

"A. No, sir, I do not.

"Q. You just didn't see him long enough period of time to form any judgment about it at all?

"A. Not at that time.

"Q. This was just a flash?

"A. Similar to it, yes.

"Q. When you did see the truck, Mr. Deemer, was it right in the center of your headlight beam?

"A. Seems to me that it was, yes.

"Q. Now could you tell me where the truck was in relation to the locality or what part of the road it was in?

"A. It was in the right-hand driving lane.

"Q. Did you have an opportunity to guide the car around it?

"A. Evidently not or I would have done it.

"Q. Did you hit your brakes as soon as you saw this—

"A. Evidently. I was in a skid.

"Q. Do you have any conscious recollection of applying your brakes?

"A. No, sir, I don't remember that either.

"Q. Do you recall the impact at all?

"A. Just momentarily remembrance. I just remember seeing the truck and Mr. Reichart jump for the ditch and I don't remember much of the actual impact. I remember immediately after the impact.

"Q. Prior to the time then you really hadn't seen anything that would indicate any danger to you at all, had you?

"A. Not in the road ahead, no, sir.

"Q. Nothing to indicate any situation that would require reduced speed until you saw the truck and the man loom before you.

"A. Yes, sir."

Plaintiff lost consciousness soon after the impact and did not regain it until he was in the hospital.

Mr. Ireland left Arrington with his headlights on, headed for Larkinburg. As he approached the Elk Creek Bridge from the east he saw no lights. As he left the west side of the bridge he could see some lights on stationary vehicles, headlights on plaintiff's car and front parking lights on defendant's truck; he did not know about defendant's rear lights.

A highway patrolman arrived on the scene soon after the collision. Skidmarks made by plaintiff's vehicle measured seventy-six feet to the point of impact. The skidmarks of the left rear dual wheels of defendant's truck indicated these wheels were seventeen feet eight inches south of the north edge of the twenty-four foot highway. The truck was moved twenty-four to twenty-five feet by the force of the impact. The patrolman talked to the defendant at the scene. Defendant said he had stopped his truck to talk to his friend Wheeler and that he started back to his truck when he heard a car coming but had to jump into the ditch before he got there. He stated to the patrolman he could not remember whether his lights were on or off and Wheeler "said the same thing." Photographs at the scene showing the skidmarks and vehicles were received in evidence. Defendant's truck was described as a brown, dirty, drab truck. The right front half of plaintiff's automobile crashed into the left rear part of the truck. The patrolman could not recall the condition of the truck lights as to being dirty but from the pictures the rear lights looked as though they were dirty. Defendant lived on a dirt road one and one-half miles off the highway. He had driven the truck over dirt roads considerably and there could have been film over the lights.

A traffic safety officer qualified as an accident reconstruction

analysis expert and testified, without objection, in response to hypothetical questions based on certain physical facts in evidence, that in his opinion plaintiff would have been driving at the time the skid marks began at a minimum speed of forty-nine miles per hour and a maximum of fifty-nine miles per hour. He further testified concerning reaction time and total braking time and distances traveled at various speeds; that average reaction time under clinical field tests is shorter when people may be expecting something to happen than it is when something unexpected happens under unusual situations because of problems of eye focusing, recognition interval, judgmental determination and development of bodily response; some people may "freeze" under the latter situation; total braking distance at a given speed is therefore more in an unusual situation than in a normal situation, and a driver could be able to stop within his range of vision in normal situations where he would not in unusual situations; he further testified respecting stopping distances applicable to both high headlight and low beam driving on automobiles comparable to plaintiffs in both normal and in unexpected situations; that once plaintiff locked the brakes and went into a skid as shown by the marks, because of the mass of the car, the driver could not turn the car from the direction in which it was started at the beginning of the skid.

Defendant, as appellant, raises no issue in his statement of points on appeal to this court as to the existence of negligence on his part. Hence it must be taken as an established fact that defendant was negligent in parking his truck on the highway as he did. Defendant does raise the issue that the trial court erred in submitting to the jury the question of whether any negligence of defendant was a proximate cause of plaintiff's damage. His basis for so contending is in effect his argument that plaintiff's negligence was the *sole* proximate cause of the collision. The question of contributory negligence on the part of the plaintiff will be dealt with in time.

To sustain defendant on the issue under discussion would require our holding that his act in parking an unlighted, or at best, a dimly lighted truck well out on the traveled portion of a blacktop highway at dusk under the particular circumstances could not as a matter of law under any theory be regarded as a contributing factor to the collision, and for all practical purposes to nullify the effect of at least two statutes enacted for traffic safety (K. S. A. 8-586, providing for exhibition of lights on parked vehicles at cer-

tain times, and K. S. A. 8-570, restricting parking upon the main traveled portion of a highway), upon which the jury was instructed in this case. We cannot thus absolve defendant. Perhaps the best refutal of this argument may be seen in defendant's own appraisal of the situation as shown by his actions at the scene when, after seeing the approaching headlights and listening to the sound, he "ran as fast as he could" to avert the consequences of the dangerous situation he had created. He did this because he realized the danger and harm that were likely to result. Unfortunately for plaintiff these fears were not groundless. The question of whether a negligent act is the proximate cause of an injury is ordinarily a question of fact for the jury. (*Greenwood v. Gardner*, 189 Kan. 68, 366 P. 2d 780), and under the evidence the trial court here did not err in applying that general rule.

Defendant next urges that the trial court erred in holding that plaintiff was not barred from recovery by his own contributory negligence, stating this involves the range of vision rule. As was recently said in *Grisamore, Administratrix v. Atchison, T. & S. F. Rly. Co.*, 195 Kan. 16, 403 P. 2d 93, wherein this rule was invoked, voked,

". . . each individual case must be determined on its particular conditions and circumstances." (p. 19.)

The rule may be broadly stated in various terms. The trial court in its instructions to the jury, unobjected to, and its corollary on lookout, stated it thus:

"No. 15

"You are instructed that it is the duty of the driver of a motor vehicle to keep his vehicle under such control as will enable him to articulate his speed with his ability to stop or turn aside within the range of his vision, and that the failure to keep his vehicle under such control constitutes negligence.

"No. 16

"You are instructed that it is the duty of a driver of a vehicle to look and see vehicles and objects in the line of his vision and in case of an accident, he will be conclusively presumed to have seen what he could have seen and should have seen in the proper performance of his duty. If he failed to see what he should have seen, then in that event, he would be guilty of negligence.

"No. 17

"You are instructed that it is the duty of every driver of a motor vehicle to keep a proper lookout at all times, the extent of such observation being dependent upon the conditions and circumstances then existing, such as weather, traffic, condition of the highway, special hazards, and the like, and not to

drive at a speed greater than is reasonable and proper under such conditions, and at all times to use due care."

Before attempting to apply the rule, it may be stated very generally the question of contributory negligence is ordinarily one of fact to be determined by the jury, it being for the jury to determine, considering the special circumstances of each particular case, whether the conduct of the party was such as would be expected by a reasonably careful person. In determining whether as a matter of law a plaintiff is guilty of contributory negligence precluding his recovery, all of the testimony favorable to the plaintiff together with all reasonable inferences and deductions to be drawn therefrom must be accepted as true, and if the facts are such that reasonable minds might reach different conclusions thereon, the question must be submitted to the jury and cannot be determined by the court as a matter of law. (See *Sponable v. Thomas*, 139 Kan. 710, 33 P. 2d 721.)

Contributory negligence is never presumed; it must be established by proof, and when the plaintiff's evidence does not disclose his contributory negligence as a matter of law, the jury has an absolute right to disbelieve and disregard all evidence tending to establish its existence. (*Drake v. Moore*, 184 Kan. 309, 314, 336 P. 2d 807.)

With these rules in mind let us consider the facts. Plaintiff while driving down a blacktop highway at a lawful speed at a time described as "darkness" and "dirty dusk" when other drivers in the area had their headlights on, collided with the rear end of a brown, dirty, drab truck with no lights (or very dimly visible lights), which truck was parked in plaintiff's lane of traffic, extending thereon more than six feet four inches. The truck was a high bed vehicle with dark undercarriage. Plaintiff had his headlights on and was looking ahead.

His recollection of events immediately before the collision, in which he sustained severe injuries, was not clear. He remembered seeing a man running, then a truck loomed up. He did apply his brakes in sufficient time to lay down seventy-six feet of skid marks. The jury had before it testimony concerning total braking distance at various speeds including factors causing a longer than usual reaction time prior to application of brakes, and it would have had a right to accept maximum reaction time in measuring plaintiff's performance as a reasonably careful person. It may or may not

have accepted the testimony offered by defendant's witness as to the blinking of the lights. Defendant and his witness were seriously impeached on their testimony as to lights on defendant's truck, and in any event the jury was not obliged to accept at face value the defense testimony on any point at issue. The jury may or may not have considered the blinking of the lights or the presence of another truck on the north side of the highway an excusable diverting factor from attention ahead. Drivers do not normally expect to have lights blinked at them from a truck on the side of a road or see trucks parked on both sides of a twenty-four foot highway only 125 to 130 feet apart, or a man running down the highway ahead of them. The jury could have concluded the truck was unlighted or at best very dimly lighted. The witness Ireland approaching the scene soon after the collision did not see any lights in defendant's truck until he was west of the Elk Creek bridge, or less than five hundred feet from the truck. The jury had before it the appearance of defendant's truck which was of such nature to make it hard to distinguish at dusk. It could have inferred the truck was virtually indiscernible until collision was imminent and unavoidable. Plaintiff saw defendant close to his truck. The record on appeal is silent as to what kind of clothing defendant may have been wearing but we can infer nothing in his favor on this score. It is a well-known fact that at dusk objects of a dark nature on a blacktop road may blend into the background so as to be virtually imperceptible until at close range.

It is not our purpose to argue the evidence. Conceding there was evidence which if accepted by the jury might have convicted plaintiff of contributory negligence under all the circumstances favorable to the plaintiff, it seems clear that reasonable minds could differ on that question and it was therefore one of fact for the jury. It must be kept in mind that the standard for judging plaintiff is the performance of a reasonably careful driver under all the circumstances.

We have examined the arguments of the defendant and cases cited by him and are of the opinion that as applied to the facts here, they are not controlling. Our case is completely different factually from Mies v. Twietmeyer, 193 Kan. 97, 392 P. 2d 118, cited in support of the argument that the failure to see what could have been seen had a proper lookout been kept constituted contributory

negligence as a matter of law. The *Mies* case involved an "open" intersection during daylight hours—a plain case of ineffectual looking having no more legal significance than if the person had not looked at all.

In *Wright v. Nat'l Mutual Cas. Co.*, 155 Kan. 728, 129 P. 2d 271, a nightime car-truck collision, by its answers to special questions the jury absolved the defendant truck driver of all negligence except one act which could not have been the proximate cause of the collision under the facts there stated.

The case of *Eldredge v. Sargent*, 150 Kan. 824, 96 P. 2d 870, in which an automobile collided with the rear of a slowly moving unlighted truck, likewise was decided upon the basis of very specific findings of fact which the court construed adversely to the plaintiff. Here the jury made general findings of fact adverse to defendant.

This is not a case where it can be said as a matter of law that plaintiff was driving in such a manner that he could not, under ordinary circumstances, have controlled his vehicle within the range of vision of his lights. Nor is it a situation where plaintiff drove blindly ahead after he knew or should have known he had no vision.

The conclusion we have reached finds support in our decisions. In *Drennan v. Penn. Casualty Co.*, 162 Kan. 286, 176 P. 2d 522, it was stated:

"Furthermore, we have recognized qualifications or exceptions to the general rule that a driver must be able to stop his car within the clear distance ahead. For instance, if he is confronted with a sudden emergency not of his making—such as the sudden entrance of another car from a side road—it would be wholly unreasonable to say, and we have not said, that negligence is shown, as a matter of law, if he is unable to stop his car in time to avoid a collision. It is perhaps inaccurate to say that such situations constitute exceptions to the rule. *It might be more accurate to say that the rule was never intended to apply except to situations which an ordinarily prudent man would or should anticipate.*" (p. 289.) (Our emphasis.)

In *Sponable v. Thomas*, 139 Kan. 710, 33 P. 2d 721, in holding the plaintiff not guilty of contributory negligence, it was said:

"Was the plaintiff guilty of contributory negligence? The argument is based on the proposition that he was not driving at a rate of speed that would enable him to stop within the distance he could see objects ahead of him. The evidence showed that the plaintiff's car was equipped with standard lights, which were in operation, and that the beam or ray of light showed forward focusing on the ground about thirty feet ahead of the car, and that the lights were

about thirty-six inches above the ground; that the truck was unpainted and a *dark, drab color;* that it had no lights, either tail or other lights at the rear, nor were there any flares or other lights to warn of its location, and that the *lower portion of the back end of the truck was about forty-seven or forty-eight inches above the ground."* (p. 719.) (Our emphasis.)

In *Drake v. Moore,* 184 Kan. 309, 336 P. 2d 807, we find the following:

"Decedent, while driving down the highway on a dark, rainy night, collided with the rear end of a semitrailer and truck that stood squarely in the middle of the traffic lane in which he was driving. There were no lights burning on the truck or trailer to warn oncoming motorists of such obstruction, as is required by law. The rear end of the trailer was a dull, drab and dirty color, making it difficult to be seen at night. The truck and trailer were stalled on an incline and the trailer was so high above the pavement level that it was above the range of decedent's headlights; as a result, the obstruction could not be seen until he was too close to avoid the collision.

"Under these facts and circumstances and in view of the presumption that decedent exercised due care for his own safety, it is clear that reasonable minds could differ on the question of whether decedent was guilty of contributory negligence. It was therefor a question of fact for the jury. Moreover, decedent, proceeding along the highway, had a right to assume there were no hidden, undisclosed defects, such as an unlighted truck, standing in the path of travel. The purpose of highways is for passage, travel, traffic, transportation and they are not maintained for the purpose of providing storage of automobiles. It is essential under our statute that an automobile or truck display a red light at the rear thereof which is visible at night, and its purpose is to provide a danger signal to overtaking traffic. A warning by proper lights is more necessary when the automobile is at rest than when it is in motion. (*McCoy v. Pittsburg Boiler and Machine Co.,* 124 Kan. 414, 261 Pac. 30; *Sponable v. Thomas,* 139 Kan. 710, 720, 33 P. 2d 721; *Towell v. Staley,* 161 Kan. 127, 134, 135, 166 P. 2d 699; *Drennan v. Penn. Casualty Co.,* 162 Kan. 286, 176 P. 2d 522.)

"In *Towell v. Staley,* 161 Kan. 127, 135, 166 P. 2d 699, which was somewhat analogous to the instant case, this court stated, in quoting from *Meneley v. Montgomery,* 145 Kan. 109, 112, 64 P. 2d 550:

" ' "Whether the driver of the coupe, in this case, was able to observe the cattle truck in her lane of traffic in time to prevent the collision, with the proper exercise of care under all the circumstances, could not be answered as a matter of law, but was a proper question for the jury. To adopt the contention advocated by appellants as conclusive in every situation where an obstruction unexpectedly appears without warning would result in the erection of a legal monstrosity, the effects of which would be too terrible to contemplate. Carried to its logical conclusion, that doctrine would mean that a vehicle approaching from an opposite direction could suddenly and without warning turn squarely in front of a car traveling at a reasonable and proper rate of speed, in its own proper lane, and thereby make the latter guilty of negligence. The contention is untenable." ' "

"We stated further at pages 135 and 139:

"'As a matter of practical comparison, it makes little difference whether the object suddenly appears in front of a car because it turned squarely in front of it, or whether the obstruction suddenly appears because of its unlighted condition and the effect of bright lights—over neither of which elements the driver of an approaching automobile has any degree of control.'

"'Surely this court would not be justified in holding that cars or trucks can be left upon the highway in defiance of the statute and the owners or drivers thereof be relieved in all cases from responding in damages by reason of a rule which holds that anyone who runs into the parked vehicles is guilty of contributory negligence as a matter of law.'

"To the same effect, see *Winfough v. Tri-State Insurance Co.*, 179 Kan. 525, 297 P. 2d 159, and *Drennan v. Penn. Casualty Co.*, supra." (pp. 314, 315, 316.)

See, also, *Kline v. Ash*, 188 Kan. 745, 366 P. 2d 276.

Defendant contends the trial court erred in giving an instruction on emergency. His objection to the trial court, which conceded that the instruction as given set out the emergency doctrine correctly, was made solely upon the ground that it was not applicable to the case. Defendant, in his answer filed in the case, also at the trial, and in his brief to this court contended that the plaintiff should have been able to guide his automobile to the left of the truck and thus avoid the collision. Instead of attempting this the plaintiff applied his brakes and was thereafter unable to change the direction of the automobile. The instruction given left it to the jury to determine the question of negligence, and in view of the afore-mentioned issue raised by the defendant, we cannot say that the instruction was inapplicable.

Defendant contends there was not sufficient evidence to support the award given by the jury for past and future pain and suffering and for past and future loss of earnings. He states he makes no complaint about the award for permanent injury. Plaintiff sustained a dislocation and comminuted fracture of the hip, torn ligaments in the hip area, a hairline fracture of the cheekbone and a severe facial laceration. When a closed reduction left the femoral head unstable, an open reduction was made on the bank side of the hip and fragments of the socket brought into position and fixed with two metal screws. Plaintiff also developed a phlebitis and had dermatitis caused by the phlebitis. He was in the hospital fifty-three days, fifty-one days in traction. After leaving the hospital plaintiff used crutches for about a month, then used a cane and returned to work parttime. There is a dull ache in connection

with the phlebitis. Plaintiff has been instructed to elevate his leg every fifteen minutes and to elevate it while sleeping. The only medical witness, an orthopedic surgeon, testified that plaintiff's participation in sports such as tennis, bowling, golf and anything that required much walking would be limited, that he expected plaintiff to suffer from a certain amount of arthritis in the future, and that disability was likely from the phlebitis. Plaintiff, forty-two years of age, had a life expectancy of twenty-six years. Besides being a salesman for a bowling equipment company, in which capacity he demonstrated the equipment by bowling himself, plaintiff also worked parttime at his filling station in Wichita. After the collision he changed jobs as a salesman because he could not bowl as well and he is not able to work as many hours in the filling station. He cannot be on his feet more than five hours without limping. He has pain on bending down on his haunches. He testified at length concerning his earnings prior to and since the collision and his anticipated earnings, indicating a substantial decrease at the filling station since his injuries. We have not attemped to detail all of the evidence the jury had before it on pain and suffering and loss of earning capacity but have shown enough to indicate that there was substantial evidence to support the award made and we cannot consider it excessive.

Plaintiff's automobile damage was partially paid by his own insurance carrier, which defendant sought to have joined as an additional party plaintiff. Defendant claims error in the trial court's refusal to order the joinder. The rule has long been established in this jurisdiction, and most recently under our present procedural act in the case of *Ellsaesser v. Mid-Continent Casualty Co.*, 195 Kan. 117, 403 P. 2d 185, that an insured property owner, who has been but partially reimbursed for his loss, is the proper party to bring suit against a third party wrongdoer for the entire loss. In case of recovery, the insured is said to hold in trust for his insurer such part of the proceeds as has been paid him on his loss.

Other contentions made by defendant have been considered but they afford no grounds for reversal of the trial court's judgment and orders and they are affirmed.

APPROVED BY THE COURT.