No. 35,687

NEAL L. HARRISON, *Appellee*, v. TRAVELERS MUTUAL CASUALTY COMPANY et al., *Appellants*.

No. 35,688

KATHRYN V. HARRISON, *Appellee*, v. TRAVELERS MUTUAL CASUALTY COMPANY et al., *Appellants*.

No. 35,689

EARL H. WEBB, *Appellee*, v. TRAVELERS MUTUAL CASUALTY COMPANY et al., *Appellants*.

No. 35,690

HELENE WEBB, *Appellee*, v. TRAVELERS MUTUAL CASUALTY COMPANY et al., *Appellants*.

(134 P. 2d 681)

Opinion filed March 6, 1943.

*Lawrence Weigand,* of Wichita, argued the cause, and *H. O. Trinkle, Ray H. Calihan, Roland H. Tate,* all of Garden City, and *Claude I. Depew, W. E. Stanley, William C. Hook* and *Lawrence E. Curfman,* all of Wichita, were on the briefs for the appellants.

*A. M. Fleming,* of Garden City, argued the cause, and *Wm. Easton Hutchison* and *C. E. Vance,* both of Garden City, were on the briefs for the appellees.

The opinion of the court was delivered by

WEDELL, J.: Four persons instituted separate actions to recover damages resulting from a rear-end collision between a car occupied by plaintiffs and a transport gasoline truck, stalled on a public highway.

The plaintiffs in the respective actions were Neal L. Harrison, his wife, Kathryn V. Harrison, Earl H. Webb, and his wife, Helene Webb. The defendants in each action were Allan J. Kayser, doing business as Kayser Transport Company, owner of the truck, the Travelers Mutual Casualty Company, and The Hawkeye Casualty Company, insurance carriers, and George Boyd Starnes and Howard L. Stoner. The last two named individuals were alternating drivers of the truck.

By agreement of the parties the four cases were consolidated for trial. During the trial plaintiffs dismissed, without prejudice, their respective actions against the defendant, The Hawkeye Casualty Company. Each and all of the plaintiffs prevailed and all defendants have appealed.

Appellees stipulated they were all engaged in a joint venture and that the negligence, if any, of one of them was imputed to each of the others. It is conceded the defendant, Kayser, is a resident of the

state of Colorado and that he was an interstate carrier of property and was legally licensed as such by the Interstate Commerce Commission under and pursuant to the federal motor carrier act of 1935 and, at the time and place in question, was engaged in an interstate operation between Hutchinson, Kan., and Denver, Colo.

In 1939 Kayser made application for and obtained a license from the corporation commission of this state, pursuant to G. S. 1935, 66-1,116, to transport property interstate from certain designated points in Kansas to Denver, Colo. Pursuant to such permit or license he deposited with the commission a policy of insurance issued by appellant, Travelers Mutual Casualty Company, in conformity with the provisions of G. S. 1935, 66-1,128. We have held such a policy, together with the rider, or endorsement, thereto attached, would permit a party damaged by a motor carrier to proceed directly against the insurer before final judgment is obtained against the motor carrier. (*Dunn v. Jones*, 143 Kan. 218, 53 P. 2d 918.) The provisions of the federal motor carrier act were not involved in that decision. The provisions of G. S. 1935, 66-1,128, were enacted in 1931. In 1935 the congress, in the exercise of its exclusive prerogative over interstate commerce, passed the motor carrier act (49 U. S. C. A., § 315) which requires of an interstate carrier a policy which will make the insurance carrier liable for damages only after .final judgment is obtained against the interstate carrier. The appellant, insurance carrier, contends: The federal and state acts are in conflict; since the enactment of the federal act the state has no further jurisdiction over the subject of insurance for an interstate carrier and that the federal act has superseded the state act where interstate commerce is involved. It therefore insists the instant action against it should have been dismissed in compliance with its motion and also that the court erred in admitting testimony in this case over the objection of all of the defendants, with the insurance carrier a party defendant. Appellees had pleaded that the filing of the insurance policy with the state corporation commission was a condition precedent to the right of Kayser to obtain a license to operate in this state as an interstate carrier. Appellees appear to have abandoned the issue presented by the pleadings, and now contend that since the policy was filed pursuant to G. S. 1935, 66-1,128, the insurance carrier cannot object to a direct action against it before final judgment against the carrier. They have not briefed the latter contention.

A decision on the insurance question, if favorable to appellants, could result only in a new trial. Other errors urged, if meritorious,

will dispose of the actions on their merits as to all parties. In view of all the circumstances we prefer to direct our attention to such alleged errors.

Appellants insist their demurrers to the evidence of appellees should have been sustained for the reason their evidence disclosed, as a matter of law, they were guilty of contributory negligence which barred recovery. Appellants also insist the trial court erred in refusing to strike certain findings of fact made by the jury and in overruling their motion for judgment on the special findings. We find it unnecessary to treat all of these contentions. It will be sufficient to consider the ruling on the motion for judgment *non obstante veredicto.*

Before considering the special finding a statement of a few general facts may be helpful. While en route from Hutchinson, Kan., to Denver, Colo., August 31, 1940, with a load of gasoline weighing over 40,000 pounds, the right rear dual tires of the transport truck went down. That was at approximately 7:30 p. m. It was on U. S. highway 50, south, and at a point approximately one and one-half miles east of Garden City. The transport was traveling west. The pavement was of cement construction, except for a strip of blacktop approximately two feet wide on the north and south sides thereof. The total width of the road was twenty feet. One of the tires mentioned was blown out and the other was flat. The north shoulder of the road was soft and rather narrow. The truck drivers pulled the transport as near to the north ditch as, in their judgment, safety permitted. They placed a jack under the rear axle and set it on the two-foot blacktop strip. The distance between the extreme south side of the transport and the center line of the road was two feet six inches. The flat tires were removed and the only spare tire the drivers had at the time was placed on the wheel in order to support the load in the event the transport should roll off the jack. The drivers went to Garden City to borrow a tire but were unable to obtain one. They then called their office at Denver and were advised a tire would be sent. They had a lunch and were taken back to the truck. They testified that before they left the truck they had placed electric flares at regulation distances on the highway both behind and in front of the truck and one flare south of the truck, between the truck and the center of the highway. They testified the transport was fully equipped with lights and reflectors as required by law and that all flares and lights were lit at the time of the colli-

sion, which occurred at approximately 11:30 that night. That testimony was corroborated by disinterested witnesses who passed the truck in the course of the evening and as late as, or later than, 11 o'clock. The testimony was supported by witnesses who appeared after the accident. The testimony pertaining to flares and lights was, however, denied by appellees and other witnesses. Some of the witnesses testified the flares and lights on the truck were not lit. Others testified they did not see them. The question pertaining to the condition of the flares and lights on the truck presented an issue of fact for the determination of the jury. The pavement was dry and the highway was level both east and west of the transport. The nearest turn on the highway was one-half or three-fourths of a mile west of the transport. It was a clear night. Appellees were traveling west on the north side of the road and, according to their testimony, about two feet north of the center line of the road. Earl Webb was driving the car, a 1937 Pontiac. He testified in substance: As they were traveling west they observed two or three cars coming from the west on the south side of the highway; he observed them a few seconds before the collision; one or two of them had bright lights; he had dimmed his lights as those cars approached but one or two of the oncoming cars did not dim their lights; the last approaching car passed appellees' car when appellees were approximately fifty feet, or less, east of the truck; he was looking ahead; when the last car passed he switched on his bright lights; it was then he observed the truck for the first time; the color of the truck was a dirty gray; he applied his brakes and swung as sharply to the left as he could but in view of the rate of speed at which he was traveling he was too close to the truck to miss it; he had been traveling at approximately fifty miles per hour, perhaps less; when he observed the oncoming cars he slackened his speed somewhat by giving the car less gasoline; he did not remember whether he continued to so slacken the speed until after the oncoming cars had passed; he first testified he could have stopped within twenty feet while traveling at fifty miles per hour but later changed that testimony by stating he had experimented since testifying previously and discovered it required about thirty-three steps or ninety-nine feet to stop, when considering both thinking time and braking distance; if there had been lights on the transport he could have seen the truck; he did not see any lights on the truck.

John Leutert, captain of the State Highway Patrol, division six,

testified on behalf of the appellees that: The highway department had a chart which revealed average distances within which a car, with good hydraulic brakes, could be stopped while traveling at various speeds; the data on the chart was obtained as a result of numerous tests; the actual braking distance within which a car, with such brakes, traveling on concrete pavement at the rate of fifty miles per hour, is approximately 131 feet; the thinking time is approximately 55 feet; the braking and thinking time combined is approximately 186 feet; he was not familiar with tests on 1937 Pontiac cars (appellees' car) but his tests showed cars with mechanical brakes did not stop as quickly as cars equipped with hydraulic brakes.

The findings of the jury, exclusive of findings pertaining to damages, were:

"1. Do you find that the operators of the truck of the Kayser Transport Company were guilty of any negligence? A. Yes.

"2. If you answer question 1 in the affirmative, then state fully of what such negligence consisted. A. Failure to attempt to move truck from highway within reasonable length of time.

"3. State at what rate of speed the car in which plaintiffs were riding was proceeding at the time that plaintiffs first saw the truck on the highway. A. Approximately 50 miles per hour.

"4. State what, if anything, prevented Earl H. Webb from stopping the car he was driving prior to reaching the Kayser Transport Company truck and colliding with it. A. No visible warning lights.

"5. State what, if anything, prevented Earl H. Webb from turning his car to the left before it collided with the Kayser Transport Company truck. A. Distance too short.

"6. State the distance the Harrison car was from the Kayser Transport Company truck when the brakes on the Harrison car were first applied. A. Approximately 20 feet.

"7. State the distance the Harrison car was from the Kayser Transport Company truck when the driver first observed the truck. A. Approximately 35 feet.

"8. State whether or not the lights on the rear of the Kayser Transport Company truck were burning immediately and just prior to the collision. A. No.

"9. State whether or not the operators of the Kayser Transport Company truck placed flares or electric lantern approximately 100 feet or 40 paces to the rear of the said transport. A. Yes.

"10. If you answer question 9 in the affirmative, state whether or not the electric lantern placed to the rear of said truck was lighted at the time of the collision. A. Yes.

"11. If you find there was at the time of the collision a lighted flare on the north side of the road to the east of the truck, was such flare in such position

and such condition that it could be readily seen by occupants of a car approaching from the east? A. No.

"12. State whether or not Earl H. Webb was guilty of any negligence which was one of the proximate causes of the collision in question. A. No.

"13. At the rate of speed at which you find Earl H. Webb was driving immediately before the collision, in how many feet could he have stopped the car? A. Approximately 75 feet.

"14. State whether or not a lighted flare or lantern was burning on the roadway side of the transport truck at the time and immediately prior to the collision. A. Yes.

"15. Did the plaintiff Earl H. Webb keep a reasonable lookout for his own safety? A. Yes."

Appellees moved to have findings 4, 6, 11, 12 and 15 set aside upon the grounds they were not supported by, but were contrary to, the evidence and inconsistent with other findings. There is evidence to support findings 4 and 11 but we find no evidence to support findings 6, 12 and 15. In any event for the purpose of reviewing a ruling on a motion for judgment on special findings, the findings made are admitted to be supported by evidence. (*Taggart v. Yellow Cab Co. of Wichita,* 156 Kan. 88, 131 P. 2d 924.) That, of course, means findings of ultimate facts as distinguished from conclusions. In a review of that ruling we must concede the findings, in the case at bar, establish negligence on the part of the appellant truck drivers. The next question is, Do the findings of ultimate facts convict the driver of appellees' car of contributory negligence which bars recovery?

Appellees argue finding number 12 conclusively settles that question in their favor. With that contention we cannot agree. The finding is definitely general in character and is in the nature of a conclusion. It is an expression of the jury's conclusion from facts found in detail (*Koster v. Matson,* 139 Kan. 124, 134, 30 P. 2d 107). Such general findings, or conclusions, if contradicted by special or detailed findings, cannot prevail but are controlled by, and must yield to, the special or detailed findings of ultimate facts. (*Railway Co. v. Laughlin,* 74 Kan. 567, 87 Pac. 749; *Koster v. Matson,* supra; *Eldredge v. Sargent,* 150 Kan. 824, 832-833, 96 P. 2d 870.) Finding number 15 is largely of the same general character and it likewise must yield to special findings of fact, if any, which contradict it.

Are there special findings of ultimate facts which are contrary to the general findings previously mentioned and which convict the driver of appellees' car of negligence which contributed directly to the collision? We think an affirmative answer to that question is inescapable. The jury expressly found appellees were driving at

approximately fifty miles per hour (finding 3) when they could not see the truck ahead of them more than thirty-five feet (finding 7) and that at such rate of speed it would have required seventy-five feet to stop (finding 13). Manifestly the jury intended to be kind to appellees in making finding number 13. Under the driver's own testimony it would have required at least 99 feet to stop. According to appellees' other witness on the subject it would have required approximately 186 feet to stop. At any rate the jury found the driver could not stop his car within the distance he could see the truck ahead of him. The driver of the car also frankly testified he could not turn aside and miss the truck at the rate of speed he was driving. He stated he was too close to turn aside after he noticed the truck.

The general rule is well established that the driver of a motor vehicle must keep his vehicle under such control as will enable him to articulate his speed with his ability to stop, or turn aside, within the range of vision provided by his headlights. This principle has been applied in numerous cases involving varied circumstances. A few of the cases are: *Giles v. Ternes*, 93 Kan. 140, 143 Pac. 491; *Rhoades v. Atchison, T. & S. F. Rly. Co.*, 121 Kan. 324, 246 Pac. 994; *Haines v. Carroll*, 126 Kan. 408, 267 Pac. 986; *Jones v. Atchison, T. & S. F. Rly. Co.*, 129 Kan. 314, 316, 282 Pac. 593; *Berry v. Weeks*, 146 Kan. 969, 972, 73 P. 2d 1086; *Eldredge v. Sargent*, supra, 832; *Robinson v. Short*, 148 Kan. 134, 79 P. 2d 903; *Goodman v. Wisby*, 152 Kan. 341, 344, 103 P. 2d 804.

The only circumstances upon which appellees now rely for taking these cases out of the general rule is that two or three cars were approaching from the west with bright lights and that one or two of them did not use their dimmers. Those facts are relied upon as constituting special circumstances which could not have been anticipated. The coming of the cars from the west was nothing that required anticipation. The highway was level. There was no turn on it west of the truck nearer than one-half to three-fourths of a mile. The brighter the lights of the oncoming cars the greater was the notice they were approaching. The meeting of cars on a main-traveled highway is a common and not a special experience of the traveling public. It will be observed the jury made no findings the driver of appellees' car was *suddenly* blinded. No special question was submitted to the jury upon the subject of *sudden* blinding. The reason is obvious. A careful search of the record discloses there was no

evidence of sudden blinding, or, for that matter, of any blinding which could not have been anticipated. The conceded facts are the driver of appellees' car noticed the bright lights and put on his dimmers, which was proper. But with his dimmers on he concedes he drove practically blind at the high rate of speed of fifty miles per hour. One who so drives, does so at his own risk and peril. (*Howard v. Zimmerman*, 120 Kan. 77, 80, 242 Pac. 131.)

The general rule has been definitely applied to persons who claimed they could not see an object on the highway by reason of bright lights of oncoming cars (*Howard v. Zimmerman*, supra); to persons driving at night with dim lights (*Fisher v. O'Brien*, 99 Kan. 621, 162 Pac. 317); to one driving at night when it is misting and raining (*Rhoades v. Atchison, T. & S. F. Rly. Co.*, supra); to one driving in foggy weather (*O'Connell v. Lusk*, 122 Kan. 186, 250 Pac. 1059); to one driving in the daytime when he cannot see objects ahead of him by reason of heavy dust (*Robinson v. Short* and *Goodman v. Wisby*, both supra, and to various other cases). See, also, G. S. 1941 Supp. 8-581; 8-582; 8-592 (d); 8-594 and 8-595. The motion of appellants for judgment on the special findings should have been sustained.

The judgment of the trial court is reversed with directions to enter judgment in favor of each and all of the defendants.