Edith TAYLOR, Widow, Respondent,

v.

George Raymond RIDDLE, Lloyd A. Fry
Roofing Company, Burris Milton Ford,
and Glen Corum, Appellants.

No. 49335.

Supreme Court of Missouri,

Division No. 2.

Dec. 14, 1964.

■■■■■■■

Leon Roulier, Colby, Kan., William H. Sanders, Dean F. Arnold, Walter F. Moudy, Kansas City, Caldwell, Blackwell, Sanders & Matheny, Kansas City, of counsel, for respondent. :

Samuel J. Molby, Kansas City, Conn Withers, Liberty, Robert L. Coleman, Kansas City, Watson, Ess, Marshall & Enggas, Kansas City, of counsel, for appellants.

LEEDY, Judge.

Action under the Kansas wrongful death statute (60–3203, 3204, Kan.G.S.1949, as amended G.S.1961 Supp. 60–3203) brought by Edith Taylor as the widow of William A. Taylor whose death resulted from injuries sustained in an automobile collision allegedly occasioned by the negligence of the defendants. Verdict and judgment against all (four) defendants in the sum of $25,000, from which judgment two (separately briefed) appeals have been taken; one jointly by George Raymond Riddle and Lloyd A. Fry Roofing Company (a corporation), and the other jointly by Burris Milton Ford and Glen Corum. These two sets or pairs of defendants were the respective owners or operators of the two large tractor-trailer rigs or outfits involved in the casualty. The third vehicle was a 1955 Mercury passenger car driven by plaintiff's decedent (hereinafter referred to as Taylor), the front end of which Mercury struck or rammed into the rear end of the Riddle-Fry trailer.

The casualty occurred on Kansas Highway 18 at about 8 p. m., on December 18, 1958, at a point .9 miles east of tthe junction of that highway with Highway 181, which junction or intersection is one mile north of the town of Sylvan Grove, and an estimated distance of 12 to 14 miles west of the town of Lincoln, Kansas. Some of the general, uncontested facts are these: The weather was clear and the road dry. Highway 18 is new, of modern construction, and has a paved asphalt or blacktop surface some 25 feet in width exclusive of the shoulders, and, in the area in question it extends east and west, is straight, and the surrounding terrain somewhat rolling; "right out of Lincoln it's not so rough, but as you get a little further west, it gets more hilly, kind of up and down." The Riddle-Fry tractor-trailer unit was proceeding west (as was the Mercury). It was approximately 40 feet long and about 8 feet wide. The trailer was a 32-foot flat bed grain trailer with sideboards 42 to 48 inches in height, carrying a load of roofing material weighing 58,000 pounds. The Ford-Corum tractor-trailer (of approximately the same length) was eastbound, carrying a cargo of wheat.

The Mercury car was owned by plaintiff's decedent's brother-in-law, Chester A. Moore. Moore and his wife (Louise) together with Taylor and his wife and the Taylor's infant son (Harry, aged 15 months) had started from their homes at or near Levant and Colby, Kansas, about 7 a. m., on the day in question and drove to Manhattan (distance estimated at 300 miles) to attend a funeral. Moore had done all the driving until the town of Lincoln was reached on the return trip, and there the group stopped, had the car serviced, and ate. Leaving Lincoln, their homeward, westbound journey was resumed but with Taylor at the wheel. It so continued until the collision, which occurred in what was referred to as a wide valley that extended east and west two and one-fourth to two and one-half miles between hillcrests. The hillcrest at the east end of the valley was the one over which both the Riddle-Fry truck and the Mercury car came upon the scene (its distance from the point of collision an estimated two-tenths to one-fourth mile).

Plaintiff's verdict-directing instructions submitted hypotheses of negligence on the part of the defendants, respectively, as follows: As against Riddle and Fry in having stopped their vehicle so as to obstruct the north half of the traveled portion of the highway in the immediate vicinity of the standing eastbound Ford-Corum vehicle when Riddle knew that such stopping created a hazard of collision to the passage of westbound traffic; and as against Ford and Corum in failing to set out fusees, flares or lights as prescribed by regulations of the Kansas Corporation Commission, after Ford knew that westbound traffic might collide with the Riddle-Fry vehicle standing alongside the Ford-Corum truck. The court also gave a concurring negligence instruction which authorized the jury, in appropriate circumstances, to return a verdict against all defendants.

■ Both sets of defendants challenge the submissibility of plaintiff's case; Ford and Corum on the sole ground that plaintiff's decedent was "contributorily negligent as a matter of law in failing to correlate his speed with his ability to stop within the range of vision provided by his headlights." Riddle and Fry urge, first, that "The evidence did not establish an illegal, wrongful, negligent or actionable stopping of their truck on the highway"; secondly, that Taylor was guilty of contributory negligence as a matter of law (and adopting in full the authorities and argument of Ford and Corum on this point). These assignments necessitate further delineation of some of the environing circumstances and conditions, but the questions raised by them are to be determined by considering "the probative facts not entirely unbelievable or opposed to the physical facts, Ducoulombier v. Thompson, 343 Mo. 991, 124 S.W.2d 1105 [5, 6] from the standpoint most favorable to the plaintiff, including facts established by defendant's evidence aiding plaintiff's case when not in conflict with plaintiff's testimony or plaintiff's fundamental theory, giving plaintiff the benefit of all legitimate favorable inferences and disregarding defendant's evidence unfavorable to plaintiff." Capra v. Phillips Investment Co., (Mo.) 302 S.W.2d 924, 929 [1]. 3 West's Missouri Digest, Part 1, Appeal and Error, ■■■

Other evidence bearing directly upon (and which is, in fact, determinative of) the question of submissibility, when considered in accordance with the rule just referred to, justifies this statement in relation to such critical facts:

As stated, Taylor was driving. His brother-in-law, Moore, was riding with him in the right front seat; Moore's wife was riding behind her husband in the right rear seat; Mrs. Taylor and the baby occupied the left rear seat behind the driver. The three surviving adults of this group testified on the part of plaintiff, and from their testimony it appears that as the Mercury topped the hillcrest an estimated two-tenths to one-fourth mile east of the point of collision, Taylor's speed was 50 to 55 m. p. h., and at that time the headlights of the Ford-Corum vehicle (then admittedly stopped in the south lane of the pavement, headed east) came into view. The headlights were "pretty bright," but not blinding. These witnesses observed no westbound traffic ahead either at that time or as they passed through the adjacent valley to the east, and could not tell whether the lighted vehicle was moving or standing, but when their car "got half way down there * * * [they] could tell that the truck was stopped." Taylor blinked his lights two or three times, then kept them on dim as he proceeded westward in his own lane. The truck headlights were not dimmed in response to his signal, but remained on bright. Taylor's speed remained constant at 50 or 55 m. p. h. until he applied his brakes, an estimated 100 or 150 feet east of the point of collision.

As either the application of the brakes was felt or the screeching of the tires was heard, or both, Mr. and Mrs. Moore and Mrs. Taylor saw for the first time the Riddle-Fry truck ahead in the westbound lane, and they were positive that what they saw

was only the top part of the truck. Until that time Moore saw nothing ahead except the two headlights. More specifically, no lights on the rear of the Riddle-Fry truck were seen by any of the passengers in the approaching Mercury "until we was real close * * * I would say twenty-five or thirty feet," and the two tractor-trailer outfits were then stopped or standing on the highway "side by side * * * abreast of each other," about five feet apart with insufficient room for a car to pass between them. It was not until that time that Mr. and Mrs. Moore saw three non-blinking red lights on the right rear of the Riddle-Fry truck, but they did not see any on the left; Mrs. Taylor saw no lights on it at any time. In this connection, Moore testified that "there was something across the road—that was going across the road between me and the truck," but he could not "make out what it was * * * until we were right in it. * * * It was smoke." Mrs. Moore stated "it appeared to be dust. Later I found out it was smoke * * *. It was [as later ascertained] coming from between the trucks that were parked side by side on the road—it just swirled around behind—the smoke was coming from the rear tires on the trailer of the eastbound truck." Both of the Moores testified that when they saw the westbound truck ahead of them it was stopped.

By application of the brakes, Taylor's speed had been reduced to not more than 15 or 20 m. p. h. at the time of the collision, but even so, the right front of the Mercury struck the left rear corner of the standing Riddle-Fry trailer, pinning the hood of the car under the bed of the trailer, with resulting fatal injuries to Taylor. The Mercury came to rest about even with the tractor part of the eastbound truck. The position of the Riddle-Fry vehicle was that its tractor was about opposite the left rear wheels of the Ford-Corum trailer, the whole vehicle being a little closer to the center of the lane than it was to the outside edge; in other words, it was not over at the edge as though it was parking or get-

ting ready to park. No part of either of the two tractor-trailer outfits was on the shoulder.

Plaintiff's witness LeRoy Gier, a farmer and lifetime resident of the area, testified to this effect: That on the night in question he was driving a pickup truck east on Highway 18 enroute to Sylvan Grove when he observed the lights of the two trucks which were then stopped on the road ahead of him. He first saw the trucks as he came over the hillcrest approximately one and one-fourth miles to the west of them; he continued on to the Sylvan Grove intersection where he turned off to the right (south) to go into town, but his attention had been attracted "by a glow up ahead in the road." After turning off he continued to watch the glow or fire and "kept seeing that light" which seemed to get larger, so that he finally "thought I'd go up and see what it was." He stopped, turned his car around, and retraced his route a half a mile or more back to Highway 18, then proceeded eastward .9 miles to the two standing trucks which he found were on the paved or traveled portion, and not off on the shoulders. There he found the "left rear corner" of the eastbound (Ford-Corum) truck was burning— "the tires and a part of the bed." There were no other vehicles there at the time; more specifically, he did not remember seeing any passenger car either to the west or to the east of either of the trucks; that if there had been one there he thought he would have seen it. The only persons he saw at the scene at that time were two men (later identified as Ford and Riddle) who "had stopped me with a flashlight." After some exchanges concerning the availability of fire fighting equipment, they requested that he summon the volunteer fire department at Sylvan Grove. (Nothing was said about an ambulance.) He agreed to do so, and proceeded forthwith to the adjacent farm home of his uncle and aunt, Mr. and Mrs. Achenbauer, and 'phoned for the fire department, as requested, and also relayed word to the sheriff's office. After making the 'phone calls he sat and chatted with

these relatives for maybe five or ten minutes, and during the course of their conversation he "heard a loud noise" or "crash," and when he returned to the location of the stopped trucks, the Mercury car was there. In this connection, he testified on cross-examination: "Q. And you said you heard a noise while you were in there [the Achenbauer residence]. Are you telling this jury that that noise that you heard was the crash of this impact or was that tires blowing out? A. I don't know, sir. I never seen it. All I know is what I heard." Without setting out further details of his testimony, the substance and import of it, when taken as a whole, is such as would support the inference that the collision did not occur prior to his arrival at the scene in the first instance; that as much as fifteen or twenty minutes may have elapsed between the time he first crested the hill and saw the lights of the trucks ahead until after driving along and watching the fire as indicated above, he "got up there the first time." When he returned to the scene after making the telephone calls there were stopped cars and trucks along the highway extending from the point of collision westward to the Achenbauer driveway, a distance of two or three hundred yards. There was perhaps some corroboration of Gier in the testimony of another of plaintiff's witnesses (Hassebroek), but, even so, it is not of enough importance to justify further extension of this statement by detailing it.

Plaintiff called Ford as a witness, but apart from testifying as to the circumstances under which he discovered the tire on fire, and the extent of it, together with certain facts going to the question of his own negligence, his direct examination had no relevancy to the question of the negligence of Riddle and Fry. The latter subject was developed on his cross-examination, and will be hereinafter separately treated.

Other evidence, if pertinent, will be stated in connection with the point or points to which it relates.

Riddle and Fry concede for present purposes that their vehicle was stopped at the moment of impact (a concession directly opposed to the testimony of Riddle and, by inference, Ford's). The first facet of the point that there was a total absence of proof of a wrongful or actionable stopping of the truck on their part is that there is no testimony in the record disputing that given by Riddle and Ford concerning the circumstances immediately surrounding the stopping of the Riddle-Fry vehicle (happenings at the scene before the Mercury came upon it, and when only Riddle and Ford were present.) These circumstances are assertedly of such nature as to completely exculpate defendants from the charged negligence.[1] These defendants are not entitled to so utilize Riddle's testimony (even if undisputed) because it was given in his own behalf as a party defendant, hence it may be considered only insofar as it may aid plaintiff's case—the antithesis of the present purpose.

■ The same result follows with respect to the testimony of Ford but for different reasons. Although a defendant himself, Ford was called as a witness by plaintiff, who proved by him an essential part of her case (that no fusees, flares or reflectors had been set out at or prior to the time of the collision). No part of his testimony on which defendants now rely was given by Ford upon examination by plaintiff's coun-

1. That as Riddle approached the scene he saw a truck headed east standing on the south part of the highway. As he got closer he saw a man (Ford) standing in the highway waving a red light. He applied the air to his brakes and slowed to a speed of three to five miles per hour by the time he got to him, at which time the man turned and ran along the side of Riddle's cab as they conversed about Ford's trouble. Riddle testified he then shifted down into second gear of his nine speed transmission and attempted to accelerate and move on past Ford's standing truck. Ford testified that he went back east waving his red light at the plaintiff vehicle, but when it veered in his direction he dived for the ditch and at that time the Riddle truck was still moving.

sel; on the contrary, all such matters were developed on cross-examination at the hands of his own or his codefendants' counsel. The rule in such a situation is that a party litigant "is only bound by the part of his adversary's testimony which he himself offers and vouches for as the truth." Shepard v. Harris, (Mo.) 329 S.W.2d 1, 4; Missouri Cafeteria v. McVey, 362 Mo. 583, 242 S.W.2d 549, 556.

It is next urged that the testimony of Mr. and Mrs. Moore that the truck was stopped on the highway is insufficient to establish such to be the fact, the argument being that they saw only the back of the truck and under the circumstances it would have been practically impossible to distinguish between a stopped truck and one moving at a low rate of speed. Similarly, it is contended that tthe testimony of Gier does not give rise to the inference that defendants' truck had been standing on the highway fifteen or twenty minutes or more before the collision, this because Gier's testimony in reference to having been attracted · by or watched the "glow" in the vicinity of the standing trucks (and by which he meant "fire or flames") is inconsistent with and contrary to the testimony of the Moores and plaintiff herself to the effect that the trailer was only smoking up until a short time after the collision. Gier and the Moores testified directly and positively in affirmation of the matters and things of which complaint is now made. Obviously, their credibility and the weight and value to be given their testimony was for the jury, and not this court on appeal.

It is also contended that if the inference mentioned did arise from Gier's testimony, it took flight when plaintiff called defendant Ford as a witness and he testified to the contrary. The first difficulty with this position is that the portions of Ford's testimony here relevant (as in the other instance involving defendants' reliance on his testimony) were not offered by plaintiff, but were developed on cross-examination by defendants' counsel, and, as ruled above, are not binding on plaintiff for that reason.

Moreover, as is implicit in the contention, Ford's testimony in the respect now under examination was contradicted by, and directly at variance with that given by other witnesses for plaintiff. It is only where the adversary's testimony, as offered by the opposite party, is uncontradicted or is the only evidence on the point that the latter is bound by such testimony. Raw v. Maddox, 230 Mo.App. 515, 519, 93 S.W.2d 282, 284; Dugan v. Rippee, (Mo.App.) 278 S.W.2d 812, 816.

Having stated the facts in that light which is most favorable to the verdict, we have no hesitancy in holding that a case of negligence was made out against Riddle and Fry (the sole complainants on that score) under the doctrine of Mills v. State Automobile Ins. Assn., 183 Kan. 268, 326 P.2d 254, and that it was proper for plaintiff to submit the hypothesis she did, unless (as both defendants contend) the evidence shows Taylor to have been guilty of contributory negligence as a matter of law.

As forecast by the facts heretofore stated, it was the presence of the smoke to the north and west of the Ford-Corum vehicle that plaintiff relied on primarily to excuse her decedent's failure to see the truck ahead with which he collided, and accordingly these further facts are relevant on the contributory negligence issue:

The fire was variously described as being stubborn; that it would come and go—kept blazing up and dying down. Because of these characteristics, both Riddle and Fry said they regarded it as being "sort of like a cat with nine lives." At times dense black smoke emanated from the fire. After the collision it was noted that it would drift or billow between the two tractor-trailer rigs and around the Mercury car. Riddle was unable to put out the fire with his extinguisher, and he admitted that "after the fire got started good" there would be enough smoke behind the rear of his trailer to block out the view of his taillights. "Q. So much you couldn't see the taillights through the smoke? A. Yes, after it got started." Al-

so, the testimony of the Moores and plaintiff herself was such as to justify the inference that the smoke was not discernible by them, as such, until they "were right in it," this because of its position behind the headlights of the Ford-Corum vehicle, which headlights, although bright, were not blinding.

Under the Kansas "assured clear vision" rule, it is held to be negligence as a matter of law to drive a motor vehicle in the nighttime at such speed that it cannot be stopped within the radius of its headlights or within a distance that objects, obstructions and danger signals can be seen ahead of it. Anastasi v. McAllister, 189 Kan. 390, 369 P.2d 244; Harrison v. Travelers Mut. Casualty Co., 156 Kan. 492, 134 P.2d 681; Goodman v. Wisby, 152 Kan. 341, 103 P.2d 804. But the rule has been relaxed to recognize certain so-called "exceptions" to it; such, for example, as the *sudden* blinding of a driver by the headlights of an approaching automobile, or other sudden emergency not of the driver's making.

The rule was held applicable, and under it the claimant deemed guilty of contributory negligence as a matter of law in the cases just cited, which are the three principally relied on by defendants. In Anastasia v. McAllister plaintiff drove along a highway when he was blinded by oncoming lights for nearly half a minute before colliding with a wrecker engaged in extricating a car from a ditch, and which wrecker had 14 large red and white lights, some blinking on and off. The truck was observable by plaintiff for a distance of 500 feet, and the lights on it had at times been seen for three quarters of a mile. When within eight to ten feet of the wrecker, the blinding lights of the oncoming car passed, and plaintiff saw the wrecker for the first time, but had no time to stop.

In Harrison v. Travelers Mutual Casualty Co., the plaintiffs were passengers in an automobile which collided with the rear end of a gasoline transport truck stalled at night on a public highway. "The only

circumstances [relied on] for taking the case out of the general rule is that two or three cars were approaching from the [opposite direction] west with bright lights and that one or two of them did not use their dimmers." Held: denied as special circumstances which could not have been anticipated (there being no element of *sudden* blinding).

In Goodman v. Wisby, the driver, in daylight, "*knowingly* had been traveling in a cloud of dust which completely obscured his vision." (Emphasis supplied.)

These bare summaries demonstrate the inapplicability of those cases to the facts at bar, for none of the elements on which those rulings were based (*knowingly* driving in a cloud of dust with completely obscured vision, and blinding by approaching headlights, not of a sudden nature) are here present.

"Exceptions to the general rule are grounded on the doctrine that the exercise of ordinary care would not necessarily have prevented the accident." Goodman v. Wisby, supra, 103 P.2d l. c. 807. A more recent declaration by the Supreme Court of Kansas anent the subject is: "It is perhaps inaccurate to say that such [sudden emergency] situations constitute exceptions to the rule. It might be more accurate to say that the rule was never intended to apply except to situations which an ordinarily prudent man would or should anticipate." Drennan v. Pennsylvania Casualty Co., 162 Kan. 286, 176 P.2d 522, 524.

As pointed out earlier, the smoke was admittedly sufficient to blot out even the taillights on the Riddle-Fry vehicle, and such smoke not being discernible by the approaching Mercury passengers on account of its color and position with reference to the headlights of the standing Ford-Corum vehicle, there was no sign or appearance that required Taylor to anticipate the hazard that actually existed ahead. Judged by the doctrine of applicability of the rule as quoted from Drennan v. Pennsylvania Casualty Co., and under the cases

of Drake v. Moore, 184 Kan. 309, 336 P. 2d 807, and Winfough v. Tri-State Ins. Co., 179 Kan. 525, 297 P.2d 159, we are of the opinion, and accordingly hold that the facts make the question of Taylor's contributory negligence one for the jury, and not one to be declared as a matter of law.

■ Error is assigned in the refusal of Ford and Corum's instruction A, which told the jury that if it found and believed that Taylor operated the car "at such a rate of speed that he was not able to slow, stop or swerve the car within the range of vision ahead as provided by the headlights on said car, and thereby avoid the collision," the verdict would be for the defendants. The substance of this instruction was contained in instruction 7 given on behalf of defendants, and this is sufficient reason for denying the present assignment without inquiring into objections interposed by plaintiff as to the form of the instruction, some of which are well taken.

■ Ford and Corum complain of the giving of instruction 2 which submitted negligence on their part in failing to set out lighted fusees, flares and reflectors as prescribed by regulations of the Kansas Corporation Commission. The first ground of complaint is that the instruction is contrary to the Kansas statutory law defining the circumstances under which flares or lighted fusees must be placed near vehicles stopped at night. The instruction conformed to provisions of the regulation, and told the jury that it was the duty of any driver operating a vehicle under a permit issued by the Kansas Corporation Commission to place flares or lighted fusees in specified positions near a vehicle that is stopped on the traveled portion of a highway at night, and indicating that such is the law without regard to whether or not the lights on the vehicle are burning. These defendants assert that under the general statute in that regard [8–5, 108 Kan.G.S.1949] there is no duty to place flares or lighted fusees near a vehicle stopped at night if the lights of such vehicle are burning. Undoubtedly

the statute has been so construed in certain instances, but none involving a conflict (if such there be) between the statute and the regulation. Rasing v. Healzer, 157 Kan. 516, 142 P.2d 832; Brittain v. Wichita Forwarding Co., 168 Kan. 145, 211 P.2d 77; Bredehoft v. Halliburton Oil Well Cementing Co., 177 Kan. 382, 279 P.2d 298; Anastasi v. McAllister, 189 Kan. 390, 369 P.2d 244. We have been cited to no case, nor has one been discovered, which limits the power of a regulatory body, such as the Kansas Corporation Commission, in prescribing safety regulations governing operations under its jurisdiction, to precisely conforming such regulations to existing general statutory provisions. At any rate, Kansas has not so held, and there a violation of such regulation makes a submissible issue of negligence. Applegate v. Home Oil Co., 182 Kan. 655, 324 P.2d 203. Inasmuch as it is conceded that no flares were put out, these defendants could not have been prejudiced by the instruction misstating the order or sequence in which the several flares, etc., were required by the regulation to be placed, and that ground of objection need not be noticed.

What has been said above necessarily disposes of the same defendants' further contention that the court erred in refusing instruction C which informed the jury that appellant Ford's legal duty under the law of Kansas did not include the placing of flares or fusees around his truck if the jury found that the lights on said truck were burning.

■ The other question raised by Ford and Corum is whether the court committed reversible error in refusing their requested instruction B, which they contend correctly submitted the existence of an emergency situation, through no fault of Ford, and the reasonableness of his conduct, in attempting to flag down deceased's automobile rather than place flares or fusees. The instruction reads:

"The Court instructs the jury that if you find and believe from the evidence that defendant Ford was faced with an emergency

by the smoke arising from his left rear dual trailer tires as mentioned in the evidence, *through no fault of Ford,* and if you further find that said emergency *required immediate and rapid action,* and that *Ford did not have time to deliberate or reflect upon the preferable or better course to pursue* when faced with that emergency, and if you further find that as Ford was bringing his tractor-trailer to a stop he saw the headlights of an oncoming (westbound) truck driven by defendant Riddle, and that *Ford acted upon the belief that there was danger of an immediate fire,* and there was *through no fault of Ford,* an emergency and Ford grabbed an electric lantern or red reflector flashlight and ran to the east toward the oncoming truck to seek assistance, and Ford did not at that time first put out a flare or fusee on the traffic side of his tractor-trailer, second, put a flare or fusee to the rear of his tractor-trailer, and, third, put a flare or fusee in front of his tractor-trailer, and if you further find that a car driven by William A. Taylor then came into view over the hill to the east at a speed of 50 or 55 miles per hour, and if you find that there then first arose the danger of a collision, and that *Ford, acting upon the belief that there was immediate danger of a collision,* ran to the east with said electric lantern or red beaked flashlight to attempt to warn the oncoming car, *instead of returning to his truck cab to attempt to put out flares or fusees* first beside his truck cab, then, next, 100 feet or 40 paces to the rear or west of his tractor-trailer and then 100 feet or 40 paces ahead or east of his tractor-trailer, and that *this situation was an emergency which arose through no fault of Ford* then you are instructed the law does not require a person faced with an emergency to *select the most favorable course of action available,* and you may consider the reasonableness of Ford's actions in determining *whether under all the circumstances defendant Ford was negligent."*

Plaintiff insists that the court acted properly in refusing the instruction "because it is quite argumentative in form, it submits Ford's personal standard of care rather than that required by law, it comments upon the evidence, and it requires a finding of facts not supported by the evidence." (In general, we have italicized the offending language in setting out the instruction.) Countering, these defendants say that the language that is objected to "is merely the time-honored language in which the constitutive elements of the emergency doctrine are customarily couched." In this connection they invite comparison of the language of the instruction with that of the Supreme Court of Kansas in stating the emergency doctrine in Meng v. Penner, 179 Kan. 789, 298 P.2d 246, 249, as follows:

"It is an elementary and general rule of law that persons suddenly placed in a position of peril or impending danger do things which ordinarily would constitute negligence, but these acts are not to be judged by ordinary rules. If an act has to be performed in a brief period [and if you further find that said emergency required immediate and rapid action] with no time for determination [and that Ford did not have time to deliberate or reflect] of the best course of action [upon the preferable or better course to pursue], negligence cannot be predicated thereon. One who acts in a sudden emergency according to his best judgment [and that Ford acted upon the belief that there was danger of an immediate fire], or one who, because of want of time in which to form a judgment [and that Ford did not have time to deliberate or reflect upon the preferable or better course to pursue when faced with that emergency], omits to act in the most judicious manner [the law does not require a person faced with an emergency to select the most favorable course of action available], is not chargeable with negligence even though there may be lamentable results. Such a person is to be dealt with in the light of his surroundings at the time, and he is not necessarily negligent even though his judgment was wrongly exercised." (The language in brackets is from instruction B.)

We hold the instruction is patently argumentative in nature, and for this reason alone its refusal was justified. Nor is it saved by, or to be otherwise viewed in the light of the foregoing comparison. See Jett v. Terminal Railroad Assn., (Mo.) 357 S.W. 2d 135, 137–138, for a somewhat analogous situation where the statement of a rule of law as found in an opinion of an appellate court (with slight adaptations for the then purpose) was held inappropriate for inclusion in an instruction for the guidance of the jury.

Riddle and Fry complain of plaintiff's verdict-directing instruction 1 (which submitted the hypothesis of Riddle having stopped his truck so as to obstruct the north half of the traveled portion of the highway in the immediate vicinity of a standing eastbound truck and thereby creating a hazard of collision to westbound traffic) did not define the issues which were tried, and was erroneous in that it ignored the admitted factual element that smoke was blowing across the pavement, and ignored the uncontradicted evidence that Riddle stopped in response to a signal by the waving of a red light in front of him on the highway (by Ford). But the difficulty with this contention is that whereas plaintiff's evidence showed Riddle had stopped alongside the Ford-Corum vehicle, Riddle himself testified that he had not stopped at the time of impact; that he was merely passing, and intended to go on west where he could clear the pavement, set out his fusees, and come back and fight the fire. Finally he said that the reason he came to a stop was that the automobile had collided with his truck. In this situation, there was no prejudicial error in giving the instruction in the form mentioned.

Riddle and Fry also contend instruction 11 (given at the request of Ford and Corum) was erroneous and prejudicial to them in that it injected a charge of negligence against them which was contrary to Ford's uncontradicted testimony, to-wit, failure on the part of Riddle to set out warning signals (of the kind and at the places required by plaintiff's instruction 2 submitting Ford and Corum's duty in that regard) as soon as possible after stopping; whereas it was to be inferred from Ford's own testimony that the Riddle-Fry vehicle had not stopped at the moment of collision, and hence there would have been no time for the placement of warning signals. The instruction directed a verdict for Ford and Corum and against plaintiff (but did not direct a verdict against Riddle and Fry) in the event a jury found such negligence on the part of Riddle and Fry. Ford and Corum were not exonerated by the verdict, so it is apparent that this instruction, even if erroneous (a question not necessary to be determined), was not followed by the jury, so in no event could there have been any resulting prejudice to Riddle and Fry.

The judgment is affirmed.

All of the Judges concur.